[Civ. No. 378. Fifth Dist. June 2, 1965.]

KATHRYN FULLERTON et al., Plaintiffs and Appellants,
v. HOUSTON FIRE AND CASUALTY INSURANCE
COMPANY et al., Defendants and Respondents.

Elledge & Cantwell and Robert R. Elledge for Plaintiffs and Appellants.

Bledsoe, Smith, Cathcart, Johnson & Rogers, Robert A. Seligson, Mayall, Hurley, Knutsen & Smith and Edwin Mayall for Defendants and Respondents.

CONLEY, P. J.—Kathryn Fullerton sustained personal injuries in an automobile collision on March 27, 1960; Eugene Disney was the driver of the other car, a 1960 Pontiac Sedan. The Pontiac was registered to Eugene Disney, doing business as Community Ambulance Service. At that time, Disney was licensed by the City of Modesto as an individual engaging in the ambulance and equipment rental business under the name of Community Ambulance Service. The Pontiac was sometimes used by him in conjunction with that business, but it was stipulated that the automobile was not being so used at the time of the accident. The record shows, in fact, that Mr. Disney was ''on a frolic of his own'' at the time of the collision, when he had a bartender and two cocktail waitresses with him, and had just left a bar at Escalon.

Kathryn Fullerton and her husband, Kenneth Fullerton, formerly brought suit against Disney, individually and doing business as Community Ambulance Service. The verdict was merely against Disney without specifying whether he was liable as Community Ambulance Service or as an individual. A judgment was entered in favor of Kathryn Fullerton for $64,250.89, besides costs, and for Kenneth Fullerton in the sum of $12,500 as damage for the loss of his wife's services in his farming activity, besides costs. The judgment for the Fullertons against Disney is final; Disney personally has gone through bankruptcy. As more particularly alleged below, Disney was covered at the time of the accident by a policy of the Ohio Casualty Company, which had been secured under the assigned risk plan, due to the fact that Disney admittedly had a bad driving record. That company has paid Kathryn Fullerton the sum of $10,000, besides costs, and it has fully exhausted its coverage for accidents, some payments having been made to persons other than the Fullertons. Concededly, the Ohio Casualty Company has performed its full duty under the assigned risk policy.

The present declaratory relief suit was brought by the Fullertons against three additional insurance companies which, prior to the accident, had issued policies to Mr. Disney individually and in his capacity as an ambulance service owner. By it, the plaintiffs sought to subject the other insurance companies to a duty to pay the Fullertons the balance of their respective judgments against Disney.

The municipal code, under which Disney was licensed, required that an ambulance business licensee in Modesto must maintain public liability insurance on all ambulances with a minimum coverage of $100,000 for one injury and $200,000 for two or more injuries. Section 3-8.06 of Ordinance No. 132-C.S. of Modesto, ''An Ordinance Adding Chapter 8, Entitled 'Licensing and Regulation of Ambulances' to Title III of the Modesto Municipal Code,'' specified the code requirement as follows: ''No license for the operation of an ambulance shall be issued, nor shall such license be valid after issuance, nor shall any ambulance be operated unless there is at all times in force and effect to provide adequate protection against liability for damages which may be or have been imposed for each negligent operation of each such ambulance, its driver, or attendant a liability insurance policy or policies approved by the Director of Finance and issued by an insurance company authorized to do business in the State of California.

''Such policy or policies shall provide protection against liability of the licensee of an ambulance for the payment of damages in amounts, at least, as follows:'' [The amounts provided were $100,000 on account of bodily injuries to or death of one person and $200,000 as the total liability of the licensee on account thereof, as a result of any one accident, also $10,000 for property damage.]

''A liability insurance policy required by this section shall inure to the benefit of any persons who shall be injured or who shall sustain damage to property proximately caused by the negligence of the licensee insured by such policy, his employees or agents.''

Section 3-8.01 of the code contained the following definition: ''Ambulance means any privately owned vehicle equipped or used for transporting those who are wounded, injured, or sick, and shall include, but is not restricted to, emergency vehicles used for such purposes.''

It will be noted that the code required insurance only on the ambulances used in the business. The automobile involved

in the collision with Mrs. Fullerton's car was not an ambulance. There was no evidence that the Pontiac automobile was equipped or used as an ambulance at any time.

In its findings, the court referred to the ordinance as follows: "The court finds that at the time and place of the accident the 1960 Pontiac passenger car was not being operated so as to come within the purview of the ordinance of the City of Modesto, Ordinance No. 132 C.S., chapter 8, section 3-8.06, or of any related sections of said ordinance."

After hearing the evidence at the lengthy trial, and heeding the arguments of counsel and their briefs, the trial court announced, in a memorandum opinion which constitutes part of the record on appeal: "That at the time said insurance policies of defendant companies were issued to Eugene Disney, Eugene Disney entered into said agreements of insurance with said defendant companies and accepted said policies of liability insurance with no misapprehension, but rather with a full understanding and with the knowledge that the 1960 Pontiac sedan involved in said accident was not covered by any of said policies of insurance; nor did Disney pay to any of said defendant companies a premium for liability insurance on said Pontiac; nor was a premium charged by any of the defendant companies for liability insurance on said Pontiac.

"That it was never the intention of the parties to the insurance contracts that the 1960 Pontiac automobile was to be covered by any of the policies issued to Disney by the defendant companies."

Both in his purely personal capacity and doing business as Community Ambulance Service, Mr. Disney had a complicated problem to solve when it became necessary to meet the requirements for total coverage by insurance policies. Carl Henry Triplett was the broker who finally worked out the necessary elements of his insurance program. The broker and his client were faced with the following rather unusual facts which had to be carefully weighed by them:

a) Disney unquestionably had a bad driving record so that, generally speaking, insurance companies would not readily accede to any request to insure him for his personal automotive operations; he was forced to take an assigned risk coverage for the Pontiac car which he customarily drove on personal missions; this type of coverage, enforced by the state, is, of course, only turned to by people with bad operational records; the assigned risk sections of the Insurance Code

are 11620 to 11629.5, inclusive, and the coverage provided in that portion of the code is intended for those "... who are in good faith entitled to but are unable to procure such insurance through ordinary methods"; the premiums under this system are much higher than for ordinary coverage, and the record indicates that the rates required for insurance in addition to the minimum required by the code were so great that Mr. Disney did not secure additional or excess risk insurance on the 1960 Pontiac passenger car;

b) The existence of the Modesto Municipal Code sections, which required as a condition to a permit to carry on business as an ambulance service the existence of insurance against public liability in the sum of $100,000-$200,000, such insurance being limited by that law to ambulances as defined in the code; and

c) The practical necessity of having insurance for the automobile personally driven by Mrs. Disney and for the risks involved in the operation of his business at the premises occupied by him and at his home and for products insurance, none of which were required by the municipal code section relating to ambulances, but which were necessary for the peace of mind of a careful business man.

Mr. Disney and his insurance broker attempted to meet all of these needs in the manner adopted by them as shown by the evidence; they assumed, as did the court in its findings, that the requirements of the situation had been met; and this conclusion by them is supported by the palpable fact that no attempt was made in the current case or otherwise to amend the policies actually issued. That Mr. Disney and the broker might have been mistaken as to the exact extent of the coverage is, of course, possible and forms the basis of the present action. For, while the intentions of an insured and his company are not to be disregarded, mere intent cannot overcome the objective provisions of an insurance policy as actually issued. The plaintiffs contend that, notwithstanding what Mr. Disney and his insurance broker thought as to the extent of the coverage, such viewpoints would have to yield to specific provisions of the insurance contracts, if, objectively, they were contrary to the assumption of the parties.

Mr. Disney's insurance program consisted of the following four policies:

1) Ohio Casualty Company Policy No. 9281086, which was the assigned risk coverage; it was first applied to Mr. Disney's

1958 Thunderbird and was later transferred to the 1960 Pontiac, which replaced the Thunderbird and which was being driven by Disney at the time of the accident; by virtue of this policy the $10,000 and costs were paid to Mrs. Fullerton on her judgment; there is no longer anything due to the plaintiffs from that company, and it is not a party to the present suit;

2) Wilshire Insurance Company Policy No. CV 301-056, which covered specifically listed ambulances and a truck of Mr. Disney, doing business as Community Ambulance Service, including only a 1959 Chevrolet 1-ton converted ambulance, a 1955 Pontiac ambulance, and a 1949 Ford ¾-ton pickup truck;

3) Houston Fire and Casualty Insurance Company Policy No. HCA-C 5550, which covered (a) a 1959 Chevrolet Bel Air 2-door sedan usually operated by Mrs. Disney, (b) the business premises in Modesto where the Disney company was located, including stores which he did not occupy, (c) personal liability for his business premises and his residence, and (d) surgical supplies and products coverage; and

4) Citizens Casualty Company of New York Policy No. SP 1108, which afforded excess coverage over and above the Wilshire and Houston policies to the limits required by the Modesto Municipal Code, and also as to other risks specifically insured by the Wilshire and Houston policies; any defense available to Wilshire or Houston would also apply to Citizens; and if the Wilshire or Houston policies did not deal with a specific exposure, the Citizens policy similarly would not cover the risk.

For the sake of convenience, the four companies will be referred to hereinafter by the respective names: Ohio, Wilshire, Houston, and Citizens.

I) Of the four insurance policies above mentioned, the Ohio policy has already been disposed of.

II) The Wilshire policy was termed a "commercial vehicle policy"; it covered the two ambulances and the Ford truck which were specifically set forth in its "fleet schedule." A premium was required as to each of the three vehicles. The first two were rated as ambulances with a normal 50-mile maximum radius of operation, and a similar 50-mile radius was prescribed for the Ford. Neither the Pontiac sedan involved in the accident, nor any vehicle other than the three is listed in the "fleet schedule." The policy defines "automobile" as (1) one described in the policy; (2) a temporary

substitute for a described automobile, and (3) a newly acquired automobile, if it replaces a described automobile. The car driven by Disney at the time of the accident was not in any of these categories. Mr. Justice Peters, in the case of *Olds* v. *General Acc. Fire etc. Corp.*, 67 Cal.App.2d 812, 821 [155 P.2d 676], points out that: "... if the insurance company could defend against the assured on the ground that the policy did not cover the loss it may defend on the same ground against the injured third person."

The trial judge, in a 16-page memorandum, discussing all of the issues in the instant case, said: "... that the defendant companies' policies of liability insurance, which include the endorsements, are definite and certain as to the particular vehicles covered by said policies."

And the trial court pointed out the general principle that: "Where there is no room or occasion for interpretation, the court's attitude under such circumstances is to construe what is definite and certain." [Citing *McMillan* v. *State Farm Ins. Co.*, 211 Cal.App.2d 58 [27 Cal.Rptr. 125].]

The appellants misapprehend the limited requirements of the Modesto City ordinance relative to insurance; they reiterate that the code required insurance on all "business vehicles." This is incorrect. The insurance related to ambulances only as defined in the ordinance, and the contention that the private Pontiac passenger automobile was a business vehicle as distinguished from an ambulance injects an element into the case that is not present under the terms of the ordinance itself. There can be no question that at the time of the accident the automobile was in no sense being used as an ambulance, or even as a business vehicle. Mr. Disney said that he occasionally took some personal property relating to the business, such as wheel chairs or oxygen cylinders, from one place to another in his passenger car. As above stated, there was no requirement in the city code that such an automobile as distinguished from an ambulance should be insured. The fact that the insurance companies certified to the coverage as required by the code has no particular significance in view of the fact that the ordinance did not require insurance for any vehicles but ambulances.

It is quite certain that the court believed that both the Wilshire policy and the Houston policy, more fully discussed hereafter, did not purport to cover, and Mr. Disney had no intention that they should cover, the 1960 Pontiac sedan,

which he was driving at the time of the collision. At that time, he was on a "frolic" of his own. Appellants seek to rewrite the insurance contract by finding liability under the city code and sections of the Vehicle Code, whereas the parties to the three insurance contracts obviously did not intend to give any coverage to Disney's Pontiac sedan. The trial judge said in his memorandum opinion : ". . . the 1960 Pontiac sedan being driven by Eugene Disney at the time said vehicle was involved in an accident (March 27, 1960) was not covered by any of the provisions of the defendant insurance company policies of liability insurance issued to Eugene Disney; nor did any liability attach to any of said insurance companies under said policies of insurance or otherwise, as a result of said accident involving said Pontiac vehicle by reason of the Modesto City Ordinance, Chapter 8, entitled 'Licensing and Regulation of Ambulances,' section 3-8.01; nor by reason of any provisions of the Vehicle Code of California."

III) We turn to the Houston policy as against which the appellants direct their principal fire. This policy is designated as a "combined comprehensive liability policy." The policy itself carried 19 endorsements attached at the time of its original issuance. The policy purported to cover expressly only one vehicle, the personal automobile of Mrs. Disney, but it did fill the gaps in the insurance program of Mr. Disney with regard to risks other than those involved in the operation of vehicles.

The basic question really reduces to this: is an insurance company entitled to select the risks against which it insures, and to restrict its policy to cover only those risks? The answer is affirmative except in a small number of situations as to which public policy expressly prevents such a contractual arrangement.

The general rule clearly is that the insurer may limit the risks as to which the policy is written. (7 Appleman, Insurance Law and Practice, § 4255, p. 17.) In *Continental Cas. Co.* v. *Phoenix Constr. Co.*, 46 Cal.2d 423, 432 [296 P.2d 801, 57 A.L.R.2d 914], the technique applicable to restrictions of coverage in an insurance policy is thus formulated: "An insurance company has the right to limit the coverage of a policy issued by it and when it has done so, the plain language of the limitation must be respected."

*San Pedro Properties, Inc.* v. *Sayre & Toso, Inc.*, 203 Cal. App.2d 750, 754 [21 Cal.Rptr. 844], states: "The insurer had the right to limit the coverage of the policy in plain

understandable language and in conformity with standard practices. [Citing authorities.] It is stated in 27 Cal.Jur.2d, section 267, pages 757-758, as follows:

" 'The purpose of an insurance contract is contingently to provide the insured with indemnity for losses that may arise from a particular risk or risks, which should be specified in the policy. The insurance company is at liberty to select the character of the risk it will assume; and it is not liable except on proof that the loss was within the terms of the policy, for these terms determine the measure of the insurer's liability.' " (See also *Boyer* v. *United States F. & G. Co.,* 206 Cal. 273, 276 [274 P. 57]; *Isaacson Iron Works* v. *Ocean Acc. & Guar. Corp.,* 191 Wash. 221 [70 P.2d 1026, 1029]; *National Auto. Ins. Co.* v. *Industrial Acc. Com.,* 11 Cal.2d 694, 698 [81 P.2d 928]; *Industrial Indem. Co.* v. *General Ins. Co.,* 210 Cal.App.2d 352, 361 [26 Cal.Rptr. 568]; *Bohrn* v. *State Farm etc. Ins. Co.,* 226 Cal.App.2d 497, 500 [38 Cal.Rptr. 77]; *Bonfils* v. *Pacific Auto. Ins. Co.,* 165 Cal.App.2d 152 [331 P.2d 766]; *McFarland* v. *New Zealand Ins. Co.,* 176 Cal.App. 2d 422, 424 [1 Cal.Rptr. 482]; *Hill* v. *Standard Mut. Casualty Co.,* 110 F.2d 1001, 1004; 28 Cal.Jur.2d, Insurance, § 509, pp. 261-265.)

When a man carries on a business such as Mr. Disney's ambulance service, he has separate and divisible risks with respect to insurance. He has a business which, as in this case, may require specialized insurance with respect to a portion of it, namely, the operation of ambulances. He also has the risks which inhere at a fixed place of operation and at his home, and, likewise, he has risks which may arise from his personal activities, such as the driving of his own car for pleasure purposes. It would seem unduly inattentive to the actual business needs of such a man to say that the risks inherent in his business cannot be separated from the risks of which he personally is the cause; and if we include the additional factors here present that as a business man he controls the driving of a number of ambulances by employees, but that, because of his own inability to drive automobiles properly, he personally is such a bad risk as to cause insurance companies generally to refuse his application for insurance relative to his personal driving, it seems consonant with good sense to say that an insurance company may write a policy of insurance on vehicles which are used in a man's business, and which may be driven by persons other than himself, at the same time refusing to contract with him to cover his public

liability if he himself is driving a passenger car on a personal mission.

In this connection, it should be kept in mind that Mr. Disney was in fact insured by the Houston policy but not with respect to all possible risks, and that he not only used this coverage but welcomed it and needed it badly; without it he could not have secured a license to carry on his ambulance service in the City of Modesto; with it, he was entitled to a certificate giving him the right to transact such business.

Respondent Houston properly contends that endorsement No. 3 of the Houston policy states that the company's liability is limited to pay for bodily injury sustained by any person "arising out of the ownership, maintenance or use of the owned automobile or any non-owned automobile"; the only owned automobile covered by the policy was Mrs. Disney's Chevrolet, which was the sole vehicle described in the "Automobile Schedule." (*Wise* v. *Strong* (Mo. App.) 341 S.W.2d 633; *Preferred Risk Mutual Ins. Co.* v. *Continental Ins. Co.*, 172 Neb. 179 [109 N.W.2d 126].) Endorsement No. 4 contained the same limitation.

This fact with respect to the Houston policy effectively supports the trial court's finding that the Houston policy does not insure the Pontiac sedan.

It is unnecessary to review in detail the various other arguments made by the appellants with respect to the Houston and Wilshire policies, because the factors heretofore discussed establish that they did not enlarge the Disney insurance available to the plaintiffs. It is sufficient to state that our view of the meaning and effect of the policies is the same as that held by the trial judge as expressed in his memorandum decision and the findings of fact and conclusions of law.

IV) The Citizens policy is concededly an excess policy, subject to exactly the same defenses as the Wilshire and Houston policies. If, as heretofore indicated, this court finds no reason to hold that either of those two primary policies effectively insured Mr. Disney in the operation of the 1960 Pontiac sedan, such holding also confirms the release of Citizens from a duty to pay any sum to the appellants. It is said by them, more or less in passing, that the Citizens policy, in form and content wholly an excess coverage instrument, should also supplement the Ohio policy as excess coverage. This contention is without a semblance of merit. The primary carriers are expressly specified in the Citizens policy as Wilshire and Houston. There is no indication of any kind in the documents

introduced in evidence, or in the testimony of witnesses, that the Citizens Casualty Company undertook, or was required by law, to act as a company carrying excess coverage on the Ohio policy.

The judgment is affirmed.

Brown (R. M.), J., and Stone, J., concurred.

A petition for a rehearing was denied June 23, 1965, and appellants' petition for a hearing by the Supreme Court was denied July 28, 1965.