[Civ. No. 28148. Second Dist., Div. Three. Jan. 13, 1966.]

PACIFIC INDEMNITY COMPANY, Plaintiff and Respondent, v. LIBERTY MUTUAL INSURANCE COMPANY, Defendant and Appellant.

Spray, Gould & Bowers for Defendant and Appellant.

Ball, Hunt & Hart and Clyde C. Beery for Plaintiff and Respondent.

KAUS, J.—Defendant, Liberty Mutual Insurance Company, appeals from a judgment to the effect that its policy covered the owner and the driver of a forklift as well as his employer and that, as between its policy and a policy issued by plaintiff, Pacific Indemnity Company, the former was primary and the latter excess.

On August 1, 1959, Don Carr Trucking Inc., (Carr) defendant's named insured, owned a Yale forklift which it had rented to Refiners Marketing Company (Refiners), plaintiff's named insured. On that day Halloran, an employee of Refiners, was operating the forklift in the course of his employment and it collided with a motorcycle operated by one Richardson. Richardson sustained very serious personal injuries and filed suit against Refiners, Carr and Halloran.

In effect at the time was a comprehensive liability policy issued by Pacific Indemnity to Refiners as the named insured. It is not questioned that this policy covers the accident in

question and all defendants to the Richardson action as named or additional insureds.[1]

Pacific Indemnity caused Messrs. Ball, Hunt and Hart to appear for all three defendants. About 10 months later it notified Liberty Mutual of its contention that the Pacific Indemnity policy was excess over a Liberty Mutual policy issued to Carr and demanded that Liberty Mutual assume the defense of the action. This being refused, Pacific Indemnity continued to defend the action and the Richardson case went to trial on March 21, 1961. At the trial Richardson dismissed against Carr and Halloran and a stipulated judgment against Refiners in the sum of $35,000 was entered and satisfied by Pacific Indemnity. Before the settlement, demand was made on Liberty Mutual that it agree to pay the $35,000 settlement offer which Richardson had then made, but the demand was refused.

The finding of the trial court that the sum of $35,000 was a fair and reasonable figure in compromise and settlement of the suit is not attacked on appeal.

The present action was filed shortly after the payment to Richardson. Standing to pursue Refiners' right under the Liberty Mutual policy is claimed by reason of paragraph 15 of the Pacific Indemnity policy which provides in effect that if the insurer makes any payment under the policy, it is subrogated to all of Refiners' rights of recovery against any other person or organization.

The *pièce de résistance* of the litigation is the Liberty Mutual policy. ■ The basic issue with respect to that policy is the question whether or not the forklift involved in the accident was a vehicle insured thereby.

The Liberty Mutual policy consists of two parts. The first part, called "Automobile Policy" is an automobile policy in the usual form providing insurance to Carr, the named insured, to any driver driving an automobile with Carr's permission (Halloran) and to any organization legally responsible for the use thereof (Refiners). The standard insuring clause obligates Liberty Mutual to pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of bodily injury, sus-

---

[1]Halloran was an additional insured under the Pacific Indemnity policy because he was a "person . . . using a . . . hired automobile" and Carr because it was, as owner, an "organization legally liable for the use thereof."

tained by any person, caused by accident and arising out of the ownership, maintenance or use of *any* automobile.

Assuming that the forklift in question was an automobile, it is obvious that the accident and the defendants in the Richardson litigation are covered by the policy unless Liberty Mutual can pull quite a rabbit out of the hat.

This is supposed to be it: the first part of the policy, which we have partially described, provides that certain declarations are made a part thereof. These declarations are a document of some 30 pages. Item 3, appearing on the front page, reads in part as follows: "The insurance afforded is only with respect to such and so many of the following coverages and hazards thereunder as are indicated by specific premium charge or charges." The same page also shows that an "advance premium" was charged for all the coverages listed.[2] Made a part of the declarations is a schedule listing 41 vehicles. The first 36 among those are all trucks, tractors, trailers and forklifts, the one in question being number 36. Vehicles 37 through 41 are automobiles whose purpose of use is described as "pleasure and business." This schedule further shows premium charges in varying amounts for coverage E (collision) for some of the vehicles, but not all. No such charge is shown for the forklift in question, but that fact is not relevant to any issue on the appeal. A summary sheet has the somewhat cryptic notation that premiums for coverages A and B are "included in gross receipts." A schedule which is part of the declarations indicates that the premium rates for bodily injury and property damage liability are $1.66 and .71 per $100 of gross receipts respectively. The declarations further contain a definition of the word "premium," the pertinent portion of which we quote in the footnote.[3] It is thus apparent that Liberty Mutual adopted

[2]Coverages A and B, being for bodily injury and property damage liability, respectively, appear in one printed box. Coverages D, E, F and G, being comprehensive, collision, fire and theft, respectively, appear in a separate box and are collectively referred to as "physical damage." Although it is obvious that the payment to Richardson was motivated by his personal injuries and not any property damage for which he may have sued, we refer, from time to time, to coverages A *and* B, because the record does not clearly show that Richardson did not have a claim for property damage which was also compromised.

[3]"Premium. The premium stated in the schedule is an estimated premium only. Upon termination of the policy, the earned premium for such automobiles shall be computed by the application of the receipts rates stated in the schedule to the amount of gross receipts "during

the gross receipts of Carr during the policy year as the measure which would determine the premium. There is absolutely nothing in the definition of "premium" which would exclude rental for the forklift from gross receipts, nor for that matter has our attention been drawn to any provision in the policy to the effect that if the receipts due to a particular piece of equipment were excluded from gross receipts, as defined in the policy, that vehicle was not insured.

At the trial *Liberty Mutual* attempted to introduce evidence that when the premium was calculated after the policy year, its auditors deducted the sum of $59 received by Carr for "pallet or lift rental" from the total gross receipts. From this premise it is then argued that no receipts for the rental of the forklift were included in the gross receipts which formed the premium base and that therefore the forklift was not an insured automobile under the policy.

While we are inclined to agree with counsel for Pacific Indemnity that there was no evidence before the trial court that the deduction of $59 referred to rentals received for the use of this particular forklift—the schedule lists several others—we do not rest our affirmance of the finding that the policy covered the forklift in question on that basis.

the policy period from all such automobiles, but such premium shall not be less than the minimum premium stated in the schedule. If the earned premium thus computed exceeds the estimated advance premium paid for such automobiles, the named insured shall pay the excess to the company; if less, the company shall return to the named insured the unearned portion paid by such insured.

"The words 'gross receipts' mean the total amount to which the named insured is entitled for the shipment or transportation of property during the policy period, whether shipment originates with the named insured or other carrier, and shall include the total amount received from the rental of equipment, with or without drivers, to any person or organization not engaged in the business of transporting property for hire by automobile and 15% of the total amount received from the rental of equipment, with or without drivers, to any person or organization engaged in the business of transporting property for hire by automobile, but gross receipts do not include:

"(a) the amount which the named insured pays to railroads, steamship lines, airlines and inter-line connecting motor carriers operating under their own state or federal permits;

"(b) direct taxes on the shipper which the named insured collects as a separate item and remits directly to a governmental division;

"(c) COD collections for cost of merchandise including collection fees;

"(d) warehouse storage charges;

"(e) advertising revenue."

There is no evidence that Refiners was "engaged in the business of transporting property for hire by automobile."

Defendant's entire argument is based on a fallacy. As already noted, item 3 of the declarations reads as follows: "The insurance afforded is only with respect to such and so many of the following *coverages* and *hazards* thereunder as are indicated by specific premium charge or charges." (Our italics.) There is, of course, a specific premium charge indicated for coverages A and B, namely $1.66 and .71 per $100 of gross receipts. Liberty Mutual not only reads the policy as if the word "automobiles" were used instead of "coverages and hazards"—it also argues that failure to include the revenue realized by Carr from a particular vehicle in the premium base, means that it is not covered because there was no "specific premium charge" for that vehicle. The fact is that there was no "specific" premium charged for any vehicle, since the premiums for coverages A and B were two lump sums.

The most that can possibly be said for Liberty Mutual's position is that their auditor, when calculating the premium after the end of the policy year, erroneously allowed Carr a credit of $59 for the rental receipts from renting pallets and forklifts, possibly from the forklift in question. This, of course, cannot affect the insurance which was in force at the time of the subject accident. As we read the definition of gross receipts which includes "the total amount received from the rental of equipment, with or without drivers," rentals for forklifts were clearly part of gross receipts.

Liberty Mutual introduced a great deal of evidence from three of its employees, the net effect of which was that under their interpretation of this insurance contract they did not think that the forklift in question was covered by the policy under consideration. We do not doubt their sincerity which was considerably buttressed by the existence of another policy issued to Carr which apparently covered the forklift without doubt, but on which Pacific Indemnity did not rely for reasons not apparent in the record.[4] We do not have that particular policy before us because it was withdrawn by stipulation and order of court, but we do not see how it could affect what we believe to be the only possible interpretation of the policy sued upon.

---

[4] One possible reason why Pacific Indemnity chose to ignore the other policy might be that its limits of liability were too low. The limits of the policy on which Pacific Indemnity did rely are $200,000 per person and $300,000 per accident.

Liberty Mutual's second point is, if we understand it correctly, that since Pacific Indemnity appeared before the court as the subrogee of Refiners, its rights are subject to equitable principles (*Meyers* v. *Bank of America etc. Assn.,* 11 Cal.2d 92 [77 P.2d 1084]); that the equities are all in Liberty Mutual's favor and that therefore it is entitled either to a complete denial of subrogation or proration of coverage or at least an offset in the amount of Carr's right of indemnity under section 17153 of the Vehicle Code.[5] In particular it is argued that the leading case of *American Auto. Ins. Co.* v. *Republic Indem. Co.,* 52 Cal.2d 507 [341 P.2d 675], which establishes that as between Pacific Indemnity's and Liberty Mutual's coverage the former is excess and the latter primary does not apply. Liberty Mutual's appeal to the equities of the situation is heavily laced with reference to the fact that Pacific Indemnity had as its named insured the employer of the actual wrongdoer and there are passing references to the fact that Pacific Indemnity has collected a premium for the issuance of its policy—apparently something sinister. All this is completely beside the point. The purpose of indemnity insurance is to provide protection for "wrongdoers" and we can see no difference between the equities of an insurer whose named insured is the employer of the actual wrongdoer and another insurer whose named insured is the owner of the vehicle which the wrongdoer operates. As far as the premium is concerned, Liberty Mutual received $2,988.93 for coverage A and $1,278.40 for coverage B. We presume that insurance rates are determined, among other things, in the light of the applicable law concerning coverage. While it is true that *American Auto. Ins. Co.* v. *Republic Indem. Co., supra,* was not decided until July 8, 1959, the Supreme Court in that case gave no consideration to the fact that Republic, the loser, may not have correctly foreseen the law declared therein. In the insurance business decisions enlarging the exposure from what was anticipated are, we believe, known as the "judicial risk" and allowed for.

We cannot distinguish the last cited case from the one before us and declare on the basis of supposed equities that the two policies herein involved should prorate.[6] As was said

[5] An identical contention was rejected in *Pacific Indem. Co.* v. *California State Auto. Assn.,* 190 Cal.App.2d 293, 295-296 [12 Cal.Rptr. 20] and need not be further considered.

[6] Pacific Indemnity's limits are $250,000 per person under its coverage A, Liberty Mutual's are $200,000.

of the rule of *American Auto. Ins. Co.* v. *Republic Indem. Co., supra,* in *Bohrn* v. *State Farm etc. Ins. Co.,* 226 Cal. App.2d 497, 506 [38 Cal.Rptr. 77] : ''The rule announced in these decisions is controlling upon the instant appeal. It cannot be said to achieve an inequitable result for in its overall operation an individual insurance carrier would only be made to pay his fair share of the burden in dual insurance situations.''

*American Motorists Ins. Co.* v. *Underwriters at Lloyd's London,* 224 Cal.App.2d 81 [36 Cal.Rptr. 297], relied on by Pacific Indemnity as calling for proration is not in point. There each ''other insurance'' clause provided that it was excess over the other.

 It is urged that the rules of strict construction against insurers (e.g., *Continental Cas. Co.* v. *Zurich Ins. Co.,* 57 Cal.2d 27, 32 [17 Cal.Rptr. 12, 366 P.2d 455] and cases therein cited) should not be invoked in favor of Pacific Indemnity, since it is not a party to the Liberty Mutual contract of insurance. It may be that this argument is advanced only to explain the somewhat doubtful liberality of the trial court in admitting the evidence from Liberty Mutual's employees heretofore mentioned. In any event, we do not believe that we have construed the Liberty Mutual policy strictly. Coverage of Refiners' for the subject accident is as plain as the nose on your face. Furthermore, public policy strongly dictates that the same rules of construction should apply where an excess insurer fulfills his obligation, defends an action and pays a reasonable settlement, as in a situation where the various insurers and insureds involved seek declaratory relief before the trial of the personal injury case or where the insurers refuse to pay a judgment. The same reasoning underlies the decision in *Continental Cas. Co.* v. *Zurich Ins. Co., supra,* pp. 35-38, where the Supreme Court disapproved a series of cases denying pro rata sharing of defense expenses where coverage is provided by one or more insurers. The old rule had placed a premium on the insurer who refuses to defend. Similarly, to deny the strict rules of construction of insurance policies to Pacific Indemnity, which appeared, defended, settled and paid would be to reward the insurer who should have done so, but sat on his hands.

At the trial there was an issue between the parties on whether or not the forklift was an automobile. This contention has been abandoned impliedly by Liberty Mutual by not raising it in its opening brief and expressly in its closing brief.[7] We therefore need not decide that point, argued at some length and quite persuasively by Pacific Indemnity. Suffice it to say that the schedule attached to the declarations of the Liberty Mutual policy lists the forklift as an "Owned Automobile" and that it was repeatedly conceded at the trial that its policy provides protection to the forklift under certain of the "physical damage" coverages, all of which, as defined in the basic policy, refer to automobiles.

Much argument is devoted by Liberty Mutual to the proposition that *Interinsurance Exchange* v. *Ohio Cas. Ins. Co.*, 58 Cal.2d 142 [23 Cal.Rptr. 592, 373 P.2d 640] and *Wildman* v. *Government Employees' Ins. Co.*, 48 Cal.2d 31 [307 P.2d 359] do not, as a matter of public policy, compel it to insure all of Carr's automobiles. We agree with that position the trouble with which is not that it is incorrect, but that it is inapplicable. Liberty Mutual insured Carr for liability arising out of the ownership, maintenance or use of any automobile. One of the agreements in the policy is that the insurance afforded by it for bodily injury and property damage liability applies with respect to all owned automobiles. While the word "automobile" is not defined as such, the trial court's finding that the forklift was an automobile is not attacked on appeal. The distinction between the *Wildman* and *Interinsurance Exchange* cases and the present one is therefore that the present case does not involve an effort by an insurer who insures a certain vehicle to limit the statutory omnibus clause, but rather an attempt, made in all good faith, to prove that a particular vehicle is not insured at all.

The judgment is affirmed.

Shinn, P. J., and Ford, J., concurred.

---

[7] "Since the forklift was not covered it was immaterial whether it was a motor vehicle or automobile or not."