Francis P. BEATTIE, Plaintiff-Appellee,

v.

ELGIN, JOLIET AND EASTERN RAIL-
WAY CO., Defendant-Appellant.

No. 11219.

United States Court of Appeals
Seventh Circuit.

Dec. 7, 1954.

Rehearing Denied Jan. 19, 1955.

Harlan L. Hackbert, Chicago, Ill.,
Stevenson, Conaghan, Velde & Hackbert,
Chicago, Ill., of counsel, for appellant.

Edward B. Henslee, Robert J. Kenney,
Chicago, Ill., Henry W. Lehmann, Chi-
cago, Ill., for appellee.

Before FINNEGAN, SWAIM and
SCHNACKENBERG, Circuit Judges.

864

SCHNACKENBERG, Circuit Judge.

This is an action arising under the Federal Employers' Liability Act, 45 U.S.C.A. § 51 et seq., to recover damages for injuries sustained by plaintiff, a switchman employed by defendant, because of defendant's alleged negligence in failing to furnish plaintiff with a reasonably safe place in which to do his work and in allowing oil or grease to remain on the steel platform of the coal dumper where plaintiff had to do his work. The jury returned a verdict for the plaintiff for $25,000. Judgment was entered on the verdict. Defendant's motion for judgment notwithstanding the verdict, or in the alternative, for a new trial was denied, and this appeal followed. The errors relied on arise out of the court's failure to direct a verdict for the defendant, or to enter judgment for the defendant notwithstanding the verdict.

There was evidence at the trial which, if believed, would have justified the jury in finding that the facts now set forth were established.

Plaintiff, about 70 years old, was working for the defendant carrier as a switchman shortly after midnight on August 20, 1950, the time of the accident. His work took him onto a coal dumper, an assignment which he had had for fifteen years or more.

This dumper, which the United States Steel Corporation owned, was an iron and steel structure with a cradle in it which was hoisted by means of a power motor and two cables. Thus a coal car placed in the cradle was lifted and tilted toward the side and emptied. The cables, made of steel and about the thickness of a man's wrist, were located one at each end of the dumper. The east cable was directly over the narrow steel platform of the cradle where plaintiff would stand when uncoupling a loaded coal car on the cradle. These cables were lubricated with a fairly fluid oil and tar mixture. Every three or four weeks steel company maintenance men daubed this mixture on the cables with a brush having a four foot long handle as the dumper was in operation. Oil fell down in drops steadily after it was applied. There was always grease around when the cars were turned upside down, and oil on the packing dropped down from the cars to the platform itself. In summer time, when it was warm, there was more grease than in winter time. The grease on the steel platform would get on the shoes of the switchmen and be tracked around and carried across the concrete abutment where the power switch was located. There was grease on the iron platform and the upright or frame of the cradle on the night of August 20, 1950, when the accident occurred. The coal dust would cover grease or oil on the platform or surrounding area. Steel company employees never cleaned up the grease on the platform. Plaintiff and the other crew members would clean the grease off the platform or cover grease and oil on the concrete abutment with ashes. It was not part of plaintiff's duty to clean up the area where he worked and in fact when cars were moving and the dumper was in operation he did not have the time to wipe or clean grease from the cradle or platform.

Plaintiff was foreman of the railroad crew of five men working at the coal dumper on August 20, 1950. The crew had a locomotive with which to move the loaded cars onto the cradle of the dumper and shove off the empties.

It was the duty of the railroad crew to spot the loaded cars on the cradle of the dumper. Plaintiff received his instructions from the dumper operator, a steel company employee, who would tell plaintiff what cars he wanted brought in. The engineer of the railroad crew then shoved these cars onto the cradle one at a time. The dumper operator standing on a platform above the cradle would shout to plaintiff "when the car was spotted," whereupon the operator set the clamps which held the cars to the rails on the cradle. Plaintiff, as a part of his duty, would then uncouple the car on the cradle from the string of cars to which it was attached and signal the engineer to pull the remaining cars to

the east. While performing these duties and setting brakes when necessary, plaintiff would stand on a narrow steel or iron platform which was part of the floor of the cradle and which went up with the rest of the cradle and the coal car to be dumped. Above the platform was the east cable.

When the spotting of a car was completed, plaintiff would step from the iron platform, which was part of the movable cradle, and onto a narrow concrete platform to the south and east of the iron platform and adjacent to a switch box having a lever, which controlled the flow of electric power to the dumper mechanism, and he would move the lever to an upright position. This concrete platform was 18 inches wide running east and west and the switch box adjacent thereto was about four feet south of the nearest rail crossing through the dumper. When standing on the narrow concrete abutment to throw the power switch, one "would be standing possibly about 1½ or 2 feet off the cradle."

The placing of the switch in an "on" position would enable the dumper operator above to operate the coal dumper mechanism by means of controls located in a cabin off the ramp or platform above the cradle on the west end of the dumper. The operator upon being apprised by a clapper that the power was turned on, would pull the controls to raise the cradle and coal car and dump the coal. The coal car on the cradle would be hoisted to a height of about 18 feet with the cradle and tilted "⅔ to ¾ of the way over" in a north direction so that the coal dumped out from that height, which was a dusty operation. Grease and oil might be expected at any and all times there on the little platform of the cradle.

Plaintiff and his railroad crew had begun their shift at 11 P.M. on August 19, 1950. After two or three cars were unloaded, plaintiff had a N. & W. loaded coal car on the cradle. Upon uncoupling this car and signaling the engineer to back the remaining cars of the string of cars away from the dumper, plaintiff stepped off the steel platform onto the narrow 18 inch concrete abutment to throw the power switch. While reaching toward the switch, plaintiff's right foot slipped forward from under him and he fell onto the cradle. As it began to rise, he clutched the south rail of the cradle and attempted to hold on. When he was about 15 feet in the air and holding onto the rising cradle rail, plaintiff jumped or fell off and was seriously injured.

This was not the first time that plaintiff had fallen down on the dumper.

Plaintiff was taken to the Mercy Hospital. His wife took home his clothes from the hospital. They were "all bloody." The soles of plaintiff's shoes, their sides and ankle parts were "greasy and dirty" with coal dirt and grease. His overalls were dirty with "coal dirt, grease and blood." He had put on clean shoes and clean overall just before he left for work the night of the accident. His shoes and clothes were never like that before after only one night's wear.

■ In considering defendant's motion for a judgment notwithstanding the verdict, the proof must be considered in the light most favorable to plaintiff. Sivert v. Pennsylvania R. Co., 7 Cir., 197 F.2d 371, at page 375.

■ It was the duty of the defendant to use reasonable care to furnish plaintiff with a safe place to work. Bailey v. Central Vermont Ry., 319 U.S. 350, at page 352, 63 S.Ct. 1062, 87 L.Ed. 1444. Of course, in any case the standard of care must be commensurate to the dangers of the business. Tiller v. Atlantic Coast Line R. Co., 318 U.S. 54, at page 67, 63 S.Ct. 444, 87 L.Ed. 610. It is a duty which becomes more imperative as the risk increases. It is a continuing duty from which the carrier is not relieved by the fact that the employee's work at the place in question is fleeting or infrequent. The fact that an employee is sent to premises not belonging to or under the control of his employer does not absolve the employer from liability for injuries he may sustain because of their unsafe condition. Terminal R. Ass'n of St. Louis v. Fitzjohn, 8

Cir., 165 F.2d 473, at page 477, 1 A.L.R. 2d 290.

Contending that the condition which is alleged to have caused plaintiff's injury was temporary, defendant relies on Kaminski v. Chicago River & Indiana R. Co., 7 Cir., 200 F.2d 1, where a railroad conductor fell through a hole along the edge of a track, which was maintained by an industrial concern into the latter's empty coal pit, while he was checking numbers on the side of cars. Plaintiff there testified that he had previously walked safely along the path which he traveled on the night of the injury, and had noticed nothing unusual or unsafe. There was no evidence as to how long the hole had been in existence. We held that the circumstances proved indicated that the condition which caused the accident had been created within a short time before plaintiff's injury and that it may have been a matter of minutes or hours. This evidence was held insufficient to charge defendant with constructive knowledge of the dangerous condition.

In the case at bar the evidence in regard to the method of operation by defendant's switchman on the coal dumper and the manner in which the cables were lubricated would justify the jury in finding that the presence of oil and grease on and around the cradle platform, which would adhere to the shoes of said switchman as he performed his duties, created an unsafe place to work. By its verdict the jury in effect so found. This was properly a question for the jury, Urie v. Thompson, 337 U.S. 163, at page 178, 69 S.Ct. 1018, 93 L.Ed. 1282, and its determination thereof the court should not disturb on a motion by defendant for judgment notwithstanding the verdict. It is a matter of common knowledge that the presence of grease and oil upon the soles and heel of a man's shoe is apt to cause him to slip and fall. Moreover, the jury would be justified in finding from this evidence that that is the way in which plaintiff's injury was brought about. Furthermore, the evidence would justify the jury in finding that this unsafe condition had existed frequently and recurringly for such a long time that defendant had constructive notice thereof. In Grand Trunk Western R. Co. v. Boylen, 7 Cir., 81 F.2d 91, at page 94, the court said that if such dangerous condition had been there sufficiently long so that the defendant, in the exercise of ordinary care, ought to have known of its presence, a finding is well justified that it did not provide a reasonable safe place for working. Inasmuch as plaintiff at the time of the accident was in a place where his assigned duties required him to be, defendant on the issue of negligence was chargeable with knowledge of the conditions which existed there from time to time which in the exercise of reasonable care it could have ascertained. See S. S. Kresge Co. v. Holland, 6 Cir., 158 F.2d 495, at page 498. In Pacific American Fisheries v. Hoof, 9 Cir., 291 F. 306, at page 308, the court said:

"As already stated, the duty (to furnish an employee with a working place and appliances which are safe) is a continuing one, and notice of defects and dangers will be imputed to the master where they could have been discovered by reasonable inspection and by the exercise of reasonable care."

Wetherbee v. Elgin J. & E. Ry. Co., 7 Cir., 191 F.2d 302, 307, relied upon by defendant, involved an unsafe condition created by the presence of a board on a track. This court, however, expressly noted the board was a "new threat" to safety, and that boards had only "on some previous occasions been found on or near tracks in the Ruberoid plant." The presence of boards was sporadic and occasional. Moreover, Wetherbee, the employee killed in the accident, was specifically charged with the duty of keeping a lookout to see that the track was clear when the accident occurred and he was stationed on the front end of the lead car at the time of the accident for that very purpose. On the other hand in the case at bar the testimony is undisputed that plaintiff

was under no duty to keep the platform area free of grease, and indeed the nature of his work precluded him from always taking the necessary steps to keep the platform clear. Even though he at times voluntarily wiped up grease and oil when he discerned their presence and had time to do so, the tendency of accumulated coal dust would naturally make it difficult in the night time to detect the presence of grease and oil.

■ Defendant's knowledge, actual or constructive, of the allegedly dangerous condition of the place where the accident occurred was a question for the jury, Urie v. Thompson, supra, whose determination thereof the court should not disturb on a motion for judgment notwithstanding the verdict.

For the reasons hereinbefore set forth, the judgment of the District Court entered November 12, 1953, and its order entered May 19, 1954, overruling defendant's motion for judgment notwithstanding the verdict, or, in the alternative, that a new trial be granted, are

Affirmed.