[Civ. No. 16668. First Dist., Div. One. May 15, 1956.]

AILRAD C. VAN HORN, Appellant, v. SOUTHERN PACIFIC COMPANY (a Corporation), Respondent.

William T. Belcher, Jr., for Appellant.

Dunne, Dunne & Phelps and R. Mitchell S. Boyd for Respondent.

AGEE, J. pro tem.*—This is an action for damages brought by an injured employee against his employer, Southern Pacific Company, under the provisions of the Federal Employers' Liability Act (45 U.S.C.A. § 51 et seq.). Plaintiff was a yard clerk whose duties required him to go into the railroad yards, walk beside the trains and take the numbers from incoming and outgoing cars. Although he had worked for Southern Pacific as a yard clerk for about seven months, the day of the accident, January 8, 1953, was the first day that he had been assigned to work in Richmond. His previous work had been in Oakland.

As part of his duties on the day of the accident, plaintiff was required to enter the premises of the Standard Oil Company to check the numbers on tank cars on sidings in its refinery. These sidings connected with Southern Pacific's tracks. The track along which plaintiff was walking at the time of the accident was owned and maintained by Standard Oil Company. Beside this track was a foot path on which plaintiff was walking, which was customarily used by Southern Pacific switchmen and clerks. In the center of the pathway

was a wooden "manhole" cover, measuring approximately 24 inches by 30 inches and being constructed of 2-inch rough lumber. Its purpose was to cover a wooden box in which there was a valve attached to an underground pipe which carried salt water. This manhole cover sat in a depression on the surface of the ground, which was several inches deep and which was surrounded at the time by a pool of rain water. The cover was not nailed down or otherwise secured. It had been raining on and off for the previous two or three weeks and, although not raining at the time of the accident, it had been raining that day. As plaintiff was walking along he stepped on the cover. He testified that it "looked safe enough" to him. Actually, it was floating on the rain water which had seeped into the box. This box just encased a square hole in the ground which had been dug for the purpose of gaining access to the valve. The hole was about 1 or $1\frac{1}{2}$ feet deep. There was no bottom to the box and there was no means of drainage other than the natural drainage into the ground. When plaintiff stepped on the cover, it shot out from under him, causing him to fall with one leg in the hole and one out and striking his back on the edge of the hole.

Defendant's motion for a directed verdict was denied. The jury was unable to agree upon a verdict and was discharged. Defendant's motion for judgment under the provisions of section 630 of the Code of Civil Procedure* was granted and plaintiff has appealed from the judgment which followed.

The rule as to motions under section 630 is the same as that applicable to nonsuits and directed verdicts. "Such motions may be properly granted 'when and only when, disregarding conflicting evidence, and giving to plaintiff's evidence all the value to which it is legally entitled, indulging in every legitimate inference which may be drawn from that evidence, the result is a determination that there is no evidence of sufficient substantiality to support a verdict in favor of plaintiff.' " (*Carpenter* v. *Atchison, T. & S. F. Ry. Co.,* 109 Cal.App.2d 18, 23 [240 P.2d 5].)

The same rule is also expressed in *Thompson* v. *Atchison, T. & S. F. Ry. Co.,* 96 Cal.App.2d 974, 976 [217 P.2d 45], as follows: "The only question to be determined is whether

*This section provides: "When a motion for a directed verdict, which should have been granted, has been denied or for any reason not granted, and the jury for any reason, has been discharged without having rendered a verdict . . . the court . . . may order judgment to be entered in accordance with the motion for a directed verdict."

there was in the record any evidence of negligence which should have been submitted to a jury." This case likewise involved a motion under section 630.

Appellant agrees that respondent is not an insurer of appellant's safety and that appellant has the burden of showing negligence on respondent's part which was a proximate cause of his injury.

■ On the other hand, it is equally well settled that it was the respondent's duty to exercise ordinary care to furnish appellant with a safe place to work. This duty extends to premises of a third party where the employee is sent by the employer to work. "Under the Federal Employers' Liability Act, the railroad employer is required to exercise reasonable or ordinary care to provide its employees with a safe place in which to work. [Citations.] And this obligation extends to premises or objects owned by a customer serviced by the railroad. [Citations.]" (*Chesapeake & Ohio Ry. Co.* v. *Thomas,* 198 F.2d 783, 786.) As was said in *Beattie* v. *Elgin, Joliet & Eastern Ry. Co.*, 217 F.2d 863, 865, 866: "The fact that an employee is sent to premises not belonging to or under the control of his employer does not absolve the employer from liability for injuries he may sustain because of their unsafe condition . . . Inasmuch as plaintiff at the time of the accident was in a place where his assigned duties required him to be, defendant on the issue of negligence was chargeable with knowledge of the conditions which existed there from time to time which in the exercise of reasonable care it could have ascertained. See *S. S. Kresge Co.* v. *Holland,* (6 Cir.) 158 F.2d 495, at page 498. In *Pacific American Fisheries* v. *Hoof,* (9 Cir.) 291 F. 306, at page 308, the court said: 'As already stated, the duty (to furnish an employee with a working place and appliances which are safe) is a continuing one, and notice of defects and dangers will be imputed to the master where they could have been discovered by reasonable inspection and by the exercise of reasonable care.' " In *Kaminski* v. *Chicago River & Indiana R. Co.*, 200 F.2d 1, 4, the court said: "Before defendant [railroad] can be charged with negligence in failing to remedy the condition which caused plaintiff's injury, or failed to warn plaintiff of the existence of such a condition, it is necessary to establish that the defendant had actual knowledge of the condition, or, in the exercise of ordinary care, should have known of its existence."

 Thus, it is clear that respondent had the duty to inspect the pathway and to warn appellant of any dangerous condition thereon of which respondent had knowledge, either actual or constructive.

The only evidence on the question of inspection is the following testimony of respondent's roadmaster: "Q. And is there, with respect to the Standard Oil tracks on that picture, is there any inspection, regular inspection of the track or walkway or the footing adjacent to that track made by Southern Pacific employees? A. No, no definite inspection." Although not entirely clear, because of the equivocal answer, it appears reasonable to infer that respondent did not make any inspection of the pathway whatsoever.

Respondent contends that an inspection would not have disclosed the danger and stresses the appellant's testimony that the cover "looked safe enough" and "appeared very solid." However, anyone inspecting the pathway for the purpose of ascertaining whether it afforded safe footing would undoubtedly have discovered the instability of the cover *if* such inspection was made immediately prior to appellant's accident. There is no evidence as to when the water in the box rose to a height sufficient to float the cover. Appellant testified that the cover was in place directly over the hole and it seems logical to conclude that it had not been floating for very long. Otherwise, it would have floated out of position. As was said in the Kaminski case, *supra* (200 F.2d at p. 4): "The only inference that can reasonably be drawn from this record is that the condition which caused the accident had been created within a short time before plaintiff's injury. It may have been a matter of minutes or of hours, hence defendant cannot on this record be charged with constructive knowledge of the condition." In the cited case, one of the railroad's customers owned and maintained a track inside of its plant. As a part of his duties, the employee was walking along a pathway beside the track checking cars. He suddenly fell through a hole and was injured. This hole was about 2 or 2½ feet square and was covered with some material (either wood or cardboard) about three-eighths of an inch thick. The appellate court held that the trial court erred in refusing to grant the railroad's motion for a directed verdict. The basis of the decision is indicated by the two portions of the opinion quoted above.

Appellant points out, however, that the condition which caused the danger was of long standing. The ground sur-

rounding the box was depressed, thus allowing the rain water to collect in a pool and then drain into the box. This depression had obviously existed for a considerable period of time and was clearly visible, as shown by the photographs admitted in evidence. The box in question had been there for "several years." A witness employed by the Standard Oil Company testified that he had seen water in similar boxes located in the yard. He stated: "I have seen water fairly close to the top but I never remember seeing it over the top of the box. . . . I have seen water in them, yes. . . . Pretty well to the top, yes." The same witness stated: "Box covers are sometimes nailed down. . . . I have known of them to be nailed down in some cases." There was no testimony as to why the box cover in question was not nailed down or otherwise secured. In its brief, respondent says the water line running through the box was a fire line and immediate access to the valve in the box was necessary. Assuming this to be so, it does not appear whether the other covers referred to by the witness were or were not on a fire line. Moreover, nailing the cover in place with one or two nails would not make the valve inaccessible in the event of an emergency.

■ The question on the issue of constructive knowledge is whether or not respondent, in the exercise of ordinary care, should have foreseen the dangerous condition which caused appellant's accident. If reasonable minds could differ, then the question is one in the first instance for the jury and the action of the trial court in granting the motion under section 630 was erroneous. The physical situation, i. e., the depressed area around the box and the wooden cover placed on top without being secured in any way might well have warned anyone making a reasonable inspection that such cover would become unstable and unsafe to walk upon if, during the rainy season, water collected in the box and rose to a height sufficient to cause the cover to float. We conclude that it was a question of fact as to whether respondent had constructive knowledge of the dangerous condition and that it was therefore error to grant respondent's motion for judgment.

■ Appellant attempted to prove also that respondent had actual knowledge of this condition prior to his injury. Appellant was injured on his first day of work at Richmond and on his first assignment. He had been specifically directed by his superior, the chief clerk, where to go and what cars to check. After the accident, appellant reported back to the chief clerk and described what had happened. The chief clerk

said: " 'Don't tell me that thing has flowed over again.' "
This testimony was stricken out by the trial court. The
ground of the ruling does not appear. Respondent's attorney
merely said: ". . . we will object and move to strike that
out," and the court replied: "Strike it out, disregard it."
The testimony was clearly an admission that the chief clerk
knew that the box had overflowed on at least one prior
occasion. His duties required him to direct the yard clerks
under him where to go in the performance of their work.
He had a duty to warn such yard clerks of any dangers known
to him and with which their duties would cause them to come
into contact. Had he done so in this instance, appellant could
easily have averted the danger by merely stepping around or
over the box as he went along the pathway.

Respondent argues that the chief clerk's statement is not
admissible under the res gestae theory. Respondent also says
that if appellant was relying upon the res gestae rule, his
counsel should have made this clear to the trial court. The
record shows, however, that appellant was proceeding on the
theory that knowledge of the chief clerk (of the dangerous
condition) was imputable to his employer, the respondent
herein. Appellant's attorney made this clear when he said,
before the testimony in question was given: "What his em-
ployer said if there were any *admissions.*" (Emphasis added.)
And after this testimony was given and stricken out, he said:
"Your Honor, I believe that the entire conversation, if there
were *admissions* concerning——" (Emphasis added.) By the
dash after the word "concerning," the transcript indicates
that the court interrupted counsel and said: "I have ruled."

Under the factual situation of this case, the language of
the court in *Westman* v. *Clifton's Brookdale, Inc.,* 89 Cal.App.
2d 307, at 310-311 [200 P.2d 814], is applicable: "It is not
necessary for us to pass upon the question of whether the
declarations of Darda were a part of the res gestae. (See
*Showalter* v. *Western Pacific R. R. Co.,* 16 Cal.2d 460 [106
P.2d 895] ; *Lane* v. *Pacific Greyhound Lines,* 26 Cal.2d 575
[160 P.2d 21].) We are of the opinion that they were admis-
sible for the purpose of showing knowledge of the dangerous
condition on the part of defendant's representative in charge
of the floors of the cafeteria. Respondent's objection, and its
contention here, misses the theory upon which this evidence
was offered. ■ As stated in *Dressel* v. *Parr Cement Co.,*
80 Cal.App.2d 536, 540 [181 P.2d 962] : '. . . it is a well-
established rule "that the principal is chargeable with, and

is bound by the knowledge of, or notice to, his agent received while the agent is acting within the scope of his authority and which is in reference to a matter over which his authority extends.'' ' '' The Westman case was an action for injuries sustained by a patron when she fell down a cafeteria stairway. Testimony as to a purported statement by the cafeteria's floor manager (Darda), shortly after the accident, that there were poor lights on the stairs and that others had fallen there was excluded. A judgment in favor of the cafeteria was reversed. In *Diller* v. *Northern Calif. Power Co.*, 162 Cal. 531 [123 P. 359, Ann.Cas. 1913D 908], where plaintiffs' decedent was electrocuted upon contacting a sagging power line owned by defendant corporation, the court said, at page 538: ''Evidence of statements made to Mr. Thomas concerning the condition of the pins on the buck-arm of the angle pole was proper to show the defendant's knowledge of the unsafe condition of its line. Thomas was its agent in general charge of its power system, and notice to him of a defective construction had a direct bearing on the issue of negligence in maintenance. Similarly, it was proper to show what he had said in response to such statements.''

Respondent also justifies the striking out of the testimony on the ground that the latter portion of the appellant's answer was not responsive to the question. The record is as follows: ''Q. What did you tell him [chief clerk]? A. I told him that I had fallen in the hole there and that this here cover was up along the track and I had fallen in there and he said, shook his head and said, 'Don't tell me that thing has flowed over again.' MR. BOYD [respondent's attorney]: If Your Honor please, we will object and move to strike that out. THE COURT: Strike it out, disregard it.'' However, as was said in the Westman case, *supra*, 89 Cal.App.2d at page 314: ''The fact that an answer is not responsive to a question does not render it inadmissible [citing authorities]. When the answer includes relevant and material facts it should be permitted to stand, although not strictly responsive.'' Here, that part of the chief clerk's reply which indicated his prior knowledge of the dangerous condition was relevant and material, and, as the court continued in the Westman case, ''it was error for the court to strike it and preclude the jury from considering it.'' .

Lastly, respondent contends that appellant should have made an offer of proof as to this line of testimony. However, when a trial court states or otherwise indicates that

it will not receive evidence, a specific offer of proof is not necessary. (*Tomaier* v. *Tomaier,* 23 Cal.2d 754, 760 [146 P.2d 905] ; *Caminetti* v. *Pacific Mut. Life. Ins. Co.,* 23 Cal.2d 94, 100 [142 P.2d 741].) Here, after the trial court struck out the entire answer in question, the following occurred: "Mr. BELCHER [appellant's attorney] : Your Honor, I believe that the entire conversation, if there were admissions concerning—— THE COURT: I have ruled. All right. Mr. BELCHER: I'm sorry, Your Honor. THE COURT: I made the ruling."

It is our conclusion that the trial court erred in striking out and refusing to allow the jury to consider the testimony as to the chief clerk's statement to appellant. In our opinion this testimony, had it been admitted, would have been sufficient to justify the jury in concluding that respondent, through its chief clerk, had actual knowledge of the dangerous condition which caused appellant's accident prior to the occurrence thereof; and that this prior knowledge placed upon respondent, acting through said chief clerk, the duty to warn appellant of the dangerous condition and to take such steps as were reasonably necessary to correct this condition. How easily such correction could be made (by leveling the area around the box) is demonstrated by a photograph (Exhibit 5) taken after the condition was corrected. This photograph was admitted in evidence without objection.

The judgment is reversed.

Peters, P. J., and Bray, J., concurred.