[Civ. No. 29021. Second Dist., Div. One. May 17, 1966.]

SKYWAYS AIRCRAFT FERRYING SERVICE, INC., Plaintiff and Appellant, v. HAROLD STEVENS GARRITY STANTON, Defendant and Appellant; NORTHWEST UNDERWRITERS et al., Defendants and Respondents.

Gerald H. Gottlieb, A. J. Blackman, Marvin Zinman and Earl Klein for Plaintiff and Appellant.

Kirtland & Packard, Robert L. Wilson and Austin C. Smith, Jr., for Defendant and Appellant.

Darling, Shattuck, Hall & Call and Thomas F. Call for Defendants and Respondents.

LILLIE, J.—Skyways Aircraft Ferrying Service, Inc., sued Bird and Stanton, both Lloyd's underwriters, for breach of insurance contract (Bird on the old policy; Stanton on the new one) ; in the second and third causes of action, Skyways sued Jacobson and Northwest Underwriters for breach of warranty of authority to place insurance on the life of Jack Ford, and Jacobson for negligence in failing to obtain insurance on Ford's life. Recovery was sought in the alternative; and the jury was instructed that it could find against Stanton, but not against Jacobson and Northwest, if it found that Jacobson had actual or ostensible authority from Stanton to orally bind Ford for the type of flight on which he was engaged at the time of his death. The following verdicts were rendered: for Skyways against defendant Northwest in the sum of $49,675; for Skyways against defendant Stanton in the sum of $49,675; and for defendant Bird against Skyways. Thereafter, the trial court granted motions of Northwest for judgment notwithstanding the verdict and for new trial. Skyways' motion for new trial against Bird was denied, as was motion of Stanton. Stanton appeals from judgment against him in favor of Skyways; Skyways appeals from judgment notwithstanding the verdict and order granting motion for new trial, and from judgment against it in favor of Bird.

Skyways is engaged in ferrying and delivering airplanes on a world-wide basis; Jack Ford was its president. Bird is an individual underwriter at Lloyd's, London, subscribing to Ford's expiring policy (August 31, 1958-August 31, 1959). Stanton is an individual underwriter at Lloyd's, London, sub-

scribing to Lloyd's contract of insurance No. AOC 1247, and represented all underwriters subscribing to the contract. Jacobson was manager and senior partner of Northwest Underwriters, an insurance broker and agent; Jacobson was also president of Northwest Underwriters Agency, Inc.; he died after the action was filed but before the trial. Skyways was beneficiary of a $50,000 insurance policy on the life of Jack Ford, its president. The policy carried an expiration date of August 31, 1959, noon, Standard Time, at the residence of the assured; it had been arranged by Merritt Galbraith, then of Galbraith & Flower, Inc., through Fairfax Underwriters of Kansas City; Bird, an individual underwriter at Lloyd's, subscribed to the policy. Ford was killed while piloting a plane at Wake Island on September 1, 1959, on a ferrying flight to deliver an airplane from Wichita, Kansas, to Tokyo.

We view the evidence in a light most favorable to Skyways, as respondent on Stanton's appeal (*Crawford* v. *Southern Pac. Co.*, 3 Cal.2d 427, 429 [45 P.2d 183]; *Callahan* v. *Gray*, 44 Cal.2d 107, 111 [279 P.2d 963]) and as appellant on its appeal from judgment notwithstanding the verdict. (*Lewis* v. *Franklin*, 161 Cal.App.2d 177, 182 [326 P.2d 625].)

Galbraith, a former principal of the firm of Galbraith & Flower, Inc., had for some time handled insurance for Skyways and Ford. On August 28, 1959, Galbraith and Taylor, vice-president of Skyways, discussed over the telephone the matter of accident insurance on Ford and one Cairns (not involved herein). Taylor told him that Ford's policy, placed through Galbraith's former firm, expired on August 31, 1959. On Saturday, August 29, 1959, Galbraith called again and Taylor told him to handle the insurance. Galbraith had known Ford for many years and knew that he was in the business of ferrying private aircraft throughout the world; he had previously written insurance for Ford through Lloyd's obtained from one Jacobson. Galbraith had specialized in aviation insurance for 12 years; he had a background in aviation and was a pilot. Galbraith had written insurance for Fleetways, a firm for which Ford was chief pilot; he had obtained the insurance on Ford through Lloyd's placing it through Jacobson. Galbraith had known Jacobson for eight or ten years and knew that Jacobson specialized basically in Lloyd's coverages, odd-lines that were difficult to place in the domestic market, such as ferry flights, etc.

On Monday, August 31, 1959, at 7:30 a.m., Pacific Standard

Time, Galbraith in Tulsa, Oklahoma, called Jacobson in Portland, Oregon, relative to the Ford policy. From his experience in doing business with Jacobson ("He was one source of securing coverages of this type that were hard to get."), Galbraith believed that he would be able to effect the coverage on Ford; he remembered that Jacobson had previously placed the coverage on Ford (when Ford was with Fleetways) through Lloyd's.

Jacobson had an extensive aviation background and was familiar with the aviation industry; he specialized in "a great volume" of personal accident aviation insurance—a "very substantial amount"—all Lloyd's coverages, and held himself out as a representative of Lloyd's of London—his business letterheads used on August 31, 1959, and for five years preceding, read,

"G. F. Jacobson's
Northwest Underwriters
Lloyd's, London, Representative,"

on which he had sent several hundred letters to C. E. Heath & Co., London brokers for the underwriters (Stanton) on Contract AOC 1247. Jacobson had dealt with Lloyd's for over 20 years and had his own firm (Northwest) for nine and one-half years. He held approximately 30 different contracts of various kinds and descriptions with Lloyd's underwriters, 10 of which applied exclusively to aviation insurance; he has had Lloyd's contract of insurance, No. AOC 1247 (previously 1035), to which appellant Stanton, an individual underwriter, subscribed, for 20 or more years. Under Contract No. AOC 1247 no proposal form was required, and Jacobson had the power to bind over the telephone and could issue certificates of insurance under this contract. AOC 1247 contained the following statement: "Geographical Limits: Worldwide, but transoceanic flights by Regular Air Lines Only." (The trial judge held, as a matter of law, the words to be unambiguous, and that the ferrying service performed by Ford at the time of his death was not within the coverage of AOC 1247.) Jacobson was familiar with the terms of contract AOC 1247, having read it many times; he had sufficient experience that London underwriters usually went along with the wording of insurance certificates thereunder. Jacobson had previously written a policy for Don Flower under contract AOC 1247, which contained the following endorsement: "It is further understood

and agreed that all transoceanic flights as a pilot, . . . shall be by scheduled airlines only except as respects flights in the West Indies and Caribbean area.'' Jacobson knew Ford and that he did air ferrying of private aircraft overseas; and from 1956 through 1958 had placed personal accident aviation insurance for Ford and other pilots at Fleetways. Jacobson had also known Galbraith for some time and had done business with him for 10 years, placing a substantial number of personal accident aviation risks for him through Lloyd's under his contract AOC 1247. In August 1956 Galbraith placed through Jacobson insurance on Ford and Fleetways; Jacobson knew that Fleetways and Ford made transoceanic flights other than by regular airlines, and single engine flights over water; he issued three policies of insurance for Ford.

On August 31, 1959, Galbraith told Jacobson that he had to get Ford and Cairns of Skyways covered ''right away'' (Jacobson admitted that he knew ''it would require immediate attention''). They discussed Ford's activities in running a ferrying company (Skyways) and being a ferrying pilot for it; Jacobson asked if Ford was doing the same business as with Fleetways; Galbraith said ''Yes.'' (Jacobson admitted that he knew Ford was still engaged in transoceanic ferrying of private planes.) Jacobson told Galbraith that he could not cover single engine aircraft; Galbraith said that Ford rarely, if ever, would undertake a single engine flight. Jacobson said that the insurance could be arranged, mentioning August 31, 1959, as the date on which it would be bound, when the other policy expired. Jacobson told Galbraith that this was a risk he would like to put on the open market, but until he could get the policy details he would bind it under his cover. At that time neither Galbraith nor Jacobson had a copy of the expiring policy; Jacobson told Galbraith he wanted the policy to match the terms and look at the rate; Galbraith said he would have it sent to him immediately.

At the close of this conversation Galbraith believed that the insurance was bound, relying upon Jacobson's statement that he would bind the risk under his cover. He had no reason to question it or to believe that Jacobson's cover was not sufficiently broad to include the risk. Relative to the breadth of his cover with Lloyd's, Jacobson mentioned to Galbraith only one limitation—that single engine aircraft on overwater flights could not be covered. This was the only question raised by Jacobson; Jacobson did not mention overwater flights by other

than regular airlines. Galbraith having called Jacobson for the purpose of replacing Ford's expiring policy, and Jacobson having promised to bind him under his Lloyd's cover, Galbraith assumed that Ford was bound commensurate with the expiring policy as of August 31, 1959; and he acted accordingly. In a letter dated September 2, 1959, Jacobson wrote to C. E. Heath & Co. that ''we are possibly on the risk'' (Exh. 19) as to Ford's policy.

After reading the verdict for defendant Bird against Skyways, the clerk read the verdicts for Skyways against defendants Northwest and Jacobson, and against Stanton. Outside of the jury's presence the trial judge said he would entertain Northwest's motion for judgment notwithstanding the verdict;[1] and thereafter granted the motion, as well as Northwest's motion for a new trial on grounds of insufficiency of the evidence to justify the verdict and that the verdict is against the law.

Appellant Stanton claims that the trial court erred in granting the motion of Northwest for judgment notwithstanding the verdict because it erroneously assumed that the jury found against him (Stanton) first; and that the proper remedy for inconsistent verdicts is a new trial which the trial judge denied, citing several out-of-state cases, and some California authorities dealing with inconsistent findings by a trial court. Inasmuch as the verdicts were general and the precise theory upon which the jury made its determination is not known, we decline to speculate on its reasoning and against whom it first found. ▋ However, when two independent causes of action result in inconsistent verdicts (Jacobson was not sued

---

[1]''Let the record show in the absence of the jury that the court is of the opinion, subject to change, but at this time, the court is of the opinion that the verdicts are inconsistent, the court feeling that if they found that Mr. Stanton was bound on the contract that they couldn't very well find that Mr. Jacobson was liable because of negligence. The court at this time will order judgment be entered as far as a verdict was concerned with respect to defendant Bird, which was in favor of that defendant, the verdict be entered, judgment be entered, and, of course, with respect to the verdict of Stanton, which is the amount of the verdict plus the interest which has been stipulated to. But with respect to the judgment against Jacobson, the court at this time is going to entertain a motion for a judgment notwithstanding the verdict as to this item. Said judgment has to be suspended pending the time for a hearing on the matter. The court while this jury was out deliberating knew the problems it was having, and it would have been better if we had given some instructions to them, but one of the counsel—counsel for the plaintiff was in New York, and I didn't feel it proper to give some new instructions in his absence, but there will be a motion for the judgment n.o.v. set for some time after July 20, when the court will be back from its vacation. . . .''

for breach of insurance contract but for negligence and breach of warranty of authority to place insurance on Ford's life), California authorities uphold the one judgment based on sufficient evidence and an order granting a new trial as to the other. If the evidence herein is sufficient to support the verdict against Stanton, the trial court's action in connection with the verdict against Jacobson and Northwest is of no concern to Stanton, for if it erred in granting the motions for judgment notwithstanding the verdict and for new trial, the error prejudiced only Skyways who alone has the right to complain. (*Chance* v. *Lawry's Inc.*, 58 Cal.2d 368, 382-383 [24 Cal.Rptr. 209, 374 P.2d 185] ; *McNett* v. *Volvi*, 205 Cal. 89, 93 [269 P. 932] ; *De Arman* v. *Connelly*, 134 Cal.App. 173, 181 [25 P.2d 24].) Regardless of its other verdicts, the verdict for Skyways against Stanton reflects the jury's findings on the issues raised on the first cause of action; thus, if the evidence is sufficient to support that verdict and no reversible error appears therein, the judgment based thereon will stand.

Viewed in a light most favorable to Skyways, the prevailing party on the Stanton appeal, the record supports the implied findings of the jury that Jacobson was the agent of Stanton and had at least ostensible authority from Stanton to orally bind Ford for the type of flight on which he was engaged at the time of his death; and that a binding contract of insurance was entered with Skyways. As to the latter, Galbraith's testimony establishes that Jacobson, knowing Ford's activities and the type of risk involved, orally bound Ford under his cover with Lloyd's (AOC 1247) commensurate with the expiring policy, to take effect on August 31, 1959. The fact that the details of the policy had to be confirmed, because neither party had a copy of the expiring policy, does not. under the circumstances here, prevent the finding of a binding contract of insurance. (*Apparel Mfrs. Supply Co.* v. *National Auto. & Cas. Ins. Co.*, 189 Cal.App.2d 443, 454-458 [11 Cal. Rptr. 380].)

As to the issue of agency and Jacobson's authority, the evidence shows that under Lloyd's contract AOC 1247, to which appellant Stanton subscribed, Jacobson had the power to bind over the telephone and to issue certificates of insurance. "Ordinarily a general agent is one who has all the powers of his principal as to the business in which he is engaged, except as limited by the company to whatever it seems expedient. But in the absence of notice, actual or

constructive, to the insured of any limitations upon such agent's authority, a general agent may bind the company by any acts, agreements or representations that are within the ordinary scope and limits of the insurance business entrusted to him, although they are in violation of private instructions or restrictions upon his authority. . . ." (*Cronin* v. *Coyle,* 6 Cal.App.2d 205, 212-213 [44 P.2d 385].) Further, the court said in *Snyder* v. *Redding Motors,* 131 Cal.App.2d 416, at pages 421-422 [280 P.2d 811] : "An agent has such authority as his principal actually or ostensibly confers upon him. (Civ. Code, § 2315.) ▉ As stated in *Frasch* v. *London & Lancashire Fire Ins. Co.,* 213 Cal. 219 at page 223 [2 P.2d 147] :

" 'As a general rule the powers of an agent of an insurance company are governed by the general law of agency. His powers are varied by the character of the functions he is employed to perform. He may be a general agent with general powers, or his powers may be limited by the company; or he may be a special agent with authority limited to a specific transaction. In any event, an insurance agent, whether general or special, possesses such powers as have been conferred by the company, or as third persons have a right to assume that he possesses under the circumstances of the case ; and as a general rule his powers, as to those dealing with him, are determined by the nature of the business entrusted to him and are *prima facie* coextensive with its requirements. (*Silverberg* v. *Phenix Ins. Co.,* 67 Cal. 36, 41 [7 P. 38] ; *Marderosian* v. *National Cas. Co.,* 96 Cal.App. 295, 302 [273 P. 1093] ; 14 Cal.Jur. 454, §§ 32 and 33 ; 32 C.J. 1062, § 139.)' ' "

▉ Where an agent has apparent authority to act in the business entrusted to him, and the insured has no knowledge actual or constructive of restrictions to the contrary, the agent's power to alter or modify is coexistent with that of his principal. (4 Couch on Insurance (2d ed.) p. 87 ; *Silverberg* v. *Phenix Ins. Co.,* 67 Cal. 36, 39-40 [7 P. 38] ; *Golden Gate Motor T. Co.* v. *Great American Indem. Co.,* 6 Cal.2d 439, 443 [58 P.2d 374] ; *Ames* v. *Employers Cas. Co.,* 16 Cal.App.2d 255, 261 [60 P.2d 347].) ▉ Too, an agent may, while acting within the apparent scope of his authority, grant permits, which are in effect waivers of conditions or limitations, even though he has no actual authority to do so, provided that the insured has no knowledge of his limited powers. (4 Couch on Insurance (2d ed.) p. 80; *Cronin* v. *Coyle,* 6 Cal.App.2d 205 [44 P.2d 385].)

 Measured by the above rules, the probative facts support the finding of the jury that as to the Ford transaction, Jacobson was the agent of Stanton to perform the duties relative to the business entrusted to him, and that despite the contractual limitations in AOC 1247, of which Galbraith had no knowledge, Jacobson had at least the ostensible authority to bind the Ford risk under the contract. Galbraith and Jacobson were specialists in personal accident aviation insurance; Galbraith knew Jacobson wrote a great volume of aviation risks— all Lloyd's coverages. Jacobson held 30 contracts with Lloyd's, London, 10 of which related to aviation insurance, one of which was AOC 1247; and held himself out as a "Lloyd's, London, Representative." Jacobson's cover under Lloyd's contract AOC 1247, required no proposal form. He could bind thereunder over the telephone, issue insurance certificates under the contract, and was so experienced that London underwriters usually went along with the wording of his certificates. Lloyd's underwriters, among them Stanton, subscribing to Lloyd's contract of insurance AOC 1247, which Jacobson had held for over 20 years, surely knew that Jacobson held himself out as a "Lloyd's, London, Representative"; as such Jacobson had sent to C. E. Heath & Co., London broker for Stanton and the underwriters on AOC 1247, hundreds of letters on letterheads proclaiming him to be a "Lloyd's, London, Representative." Galbraith had long done business with Jacobson; he had Jacobson place previous coverage through Lloyd's on Ford's transoceanic ferrying activities, and Jacobson had covered Don Flower (these policies permitted private aircraft flights overseas). From his previous experience with Jacobson and knowledge that Jacobson specialized basically in Lloyd's coverages, he believed that Jacobson could and would effect coverage on Ford under one of his Lloyd's covers, and called him for that purpose. They discussed Ford's transoceanic flights in private aircraft, and Galbraith told him, in answer to Jacobson's question, that Ford was still in the same business. Jacobson knew that Ford was ferrying private planes overseas, but the only limitation he mentioned was that he could not cover single engine aircraft flights over water and then, without mentioning any further restrictions or limitations in contract AOC 1247, told Galbraith he would bind the risk under his cover as per the expiring policy until he received the details thereunder. Except for single engine aircraft flights, no other limitation on

the extent of Jacobson's cover was discussed; and Galbraith knew of no other limitation in any Lloyd's contract held by Jacobson, and had no reason to believe that AOC 1247 contained any other limitation. Nor did he have any reason to doubt that Jacobson had the authority from the underwriters (Stanton) to bind Ford as requested by him, or that he covered Ford commensurate with the expiring policy. Galbraith relied upon what Jacobson told him, and at the close of his telephone conversation with Jacobson, believed Ford to be covered.

Stanton claims error in the trial court's refusal to give his requested special instruction to the effect that plaintiff had the burden of showing a contract of insurance had been entered into and that Jacobson had ostensible authority to bind Stanton. One cannot read the lengthy instructions given by the court and not conclude that the content of Stanton's proposed instruction was more than adequately covered thereby. The court gave BAJI 21 on burden of proof and various instructions on the law of agency, citing numerous code sections, and the law of contracts. ■ The trial court's refusal to give the proposed instruction was neither error nor prejudicial. All issues of law upon which Stanton was entitled to have the jury instructed were covered; he is not entitled to cumulative repetitive instructions on points already covered by the court. (*Pandell* v. *Hischier*, 166 Cal. App.2d 693, 695-696 [333 P.2d 762].) Inasmuch as the jury was completely and properly instructed on the issues, we find no duty on the part of the court to correct Stanton's proposed instruction, which in some respects was erroneous, and give it to the jury. (*Kuehn* v. *Lowthian*, 124 Cal.App.2d 867, 872-873 [269 P.2d 666].)

Most of Stanton's remaining contentions are predicated upon the theory that the evidence does not support an agency relationship between him and Jacobson. First he claims it was prejudicial for the judge to admit in evidence against him the answers of Jacobson to certain interrogatories. It appears that Jacobson's deposition was read first. (The trial judge has the right to regulate the order of proof during a trial.) In the latter part of the deposition, reference was made to answers given by Jacobson to several interrogatories. When Stanton objected, the trial judge, and properly so, said that he could not know at that point what plaintiff intended to offer and overruled the objections, to be renewed at a future date; they

were later overruled. Jacobson's answers to the interrogatories dealt primarily with his conduct and actions and his knowledge or state of mind, not statements made by him. The factual questions whether Jacobson was the agent of Stanton and whether he had the authority to bind Stanton on the Ford risk, were for the jury. By the time the interrogatories were referred to, enough evidence of agency had been received that Jacobson's answers were admissible to prove the nature and scope of his authority (*Shields* v. *Oxnard Harbor Dist.*, 46 Cal.App.2d 477, 488 [116 P.2d 121]); any declarations or admissions of Jacobson were admissible against Stanton (Code Civ. Proc., § 1870 subd. 5.); and any knowledge of or notice to Jacobson, received while acting within the scope of his authority with reference to the matter over which his authority extended, is binding on the principal (Stanton). (*Dressel* v. *Parr Cement Co.*, 80 Cal.App.2d 536, 540 [181 P.2d 962]; *Van Horn* v. *Southern Pac. Co.*, 141 Cal.App.2d 528, 535-536 [297 P.2d 479].) One answer dealt with Jacobson's letterhead proclaiming him to be a "Lloyd's, London, Representative." As to this, there was adequate proof that Lloyd's and appellant Stanton knew of the representation inasmuch as several hundred letters were sent to their broker in London on the letterhead.

Again appellant Stanton predicates his argument that the trial court erred in admitting Jacobson's "possible admissions" against him on the theory that Jacobson was not his agent relative to the Ford risk and he never placed Jacobson in a position to bind him on the basis of actual, apparent or ostensible authority. Inasmuch as the jury was called upon to determine whether Jacobson was an agent of Stanton and whether a contract of insurance was entered into, evidence of Jacobson's knowledge and state of mind at the time the Ford risk was bound was relevant. Thus, evidence of prior coverage of Ford and Fleetways placed through Lloyd's by Jacobson reflected Jacobson's knowledge of Ford's activities at the time the jury found he was acting as an agent for Stanton. Statements made by Jacobson in the correspondence referred to by appellant Stanton were written by Jacobson the same day he learned of Ford's death (September 2), at a time when the matter of insurance was in controversy, and were admissible. (*Brumley* v. *Barney O'Hern Trucking Co.*, 152 Cal.App.2d 514, 518 [314 P.2d 200].) The jury found, and we have hereinabove held the finding to be supported by

sufficient evidence, that despite the limitation in contract AOC 1247, Jacobson had at least ostensible authority to bind the risk under the contract. As to the Ford transaction, Jacobson was an agent of Stanton to perform the duties entrusted to him, and his admissions regarding that transaction were properly admitted in evidence. (*Cronin* v. *Coyle*, 6 Cal.App.2d 205, 212-213 [44 P.2d 385].)

Stanton's challenge to the trial court's instruction submitting the issue whether transoceanic ferry flights were covered despite the limitation in insurance contract No. AOC 1247, is without merit. Outside of the presence of the jury, the trial court held as a matter of law, and properly so, the words, ''GEOGRAPHICAL LIMITS: Worldwide, but transoceanic flights by Regular Air Lines Only'' to be unambiguous, and that the ferrying service performed by Ford at the time of his death was not within the coverage of AOC 1247. This ruling was favorable to Stanton, but even so, Skyways was entitled to have the jury determine the factual issue whether Jacobson bound the risk on behalf of Stanton. Accordingly, the trial judge gave a special instruction on that point *at the request of* appellants Bird and *Stanton*; it instructed the jury to determine the factual question whether transoceanic ferry flights were covered despite the terms of the condition. Without question, the instruction was proper; it required the jury to determine the very crux of Skyways' case. In the light of our conclusions above, we deem further discussion of whether Jacobson bound Stanton under AOC 1247 and Jacobson's authority to do so, to be unnecessary.

Neither will we repeat the evidence in considering Skyways' appeal from judgment notwithstanding the verdict and order granting motion for a new trial. Skyways sued Stanton and Bird, each representing different groups of underwriters at Lloyd's, London, for breach of insurance contract, and in the alternative, if there was none, to recover damages from Northwest and Jacobson for breach of warranty of authority and negligent failure to insure Ford. Jacobson's version of the August 31, 1959, telephone conversation with Galbraith differed from that of Galbraith in only one material respect— he said that he told Galbraith that he would bind Ford under his Lloyd's cover but that Ford's overseas flights by private aircraft were excluded. On the other hand, Galbraith testified in his deposition that, fully aware that Ford was engaged in overseas flights by private aircraft, Jacobson told him he

would bind Ford under his Lloyd's cover and that the only limitation related to flights over water by single engine aircraft. ▮ Inasmuch as we have concluded that the evidence considered in a light most favorable to Skyways points to a binding contract of insurance on Ford's life, in that Jacobson bound Ford under AOC 1247 for personal accident insurance as per the terms and conditions of his expiring policy on August 31, 1959, and supports the verdict against Stanton, there is no merit to Skyways' contention that Jacobson and Northwest should have been held for breach of warranty of authority and negligence in failing to place insurance on Ford, for there is not sufficient evidence to support the verdict against them. The evidence shows that Jacobson did exactly what Galbraith asked him to do; moreover, Jacobson and Northwest were not sued for breach of insurance contract. The judgment notwithstanding the verdict and order granting motion for new trial were proper.

▮ With reference to appeal from judgment in favor of Bird, Skyways asks this court to interpret a letter (Exh. 15) dated July 17, 1959, from J. H. Minet, London broker for Bird (underwriter on Ford's policy which expired August 31, 1959), to Fairfax Underwriters of Kansas City, Missouri (United States brokers on the policy), as a renewal of the expiring policy creating a contract. The letter stated: "We have arranged provisional renewal. . . ." Whether the letter constituted a contract of renewal of the old policy was a question of fact for the jury; the letter was but one piece of evidence to be considered by it on the issue whether there was in fact a renewal of the expiring policy. The contention of Skyways that we should interpret this writing constitutes a feeble effort to overturn a proper judgment.

The evidence viewed in a light most favorable to Bird (*Crawford* v. *Southern Pac. Co.*, 3 Cal.2d 427, 429 [45 P.2d 183]) shows that notice of the expiration of the old policy was given to Skyways by a letter from Galbraith & Flower, dated July 3, 1959, upon which Jack Ford wrote "renew with Jack Galbraith only." Skyways knew nothing of Fairfax Underwriters, J. H. Minet & Co., or Bird at that time. When Taylor, vice-president of Skyways, communicated with Galbraith concerning a "renewal" of the expiring policy, Galbraith, who was no longer with Galbraith & Flower, sought to procure accident insurance for Ford, not through Fairfax, Minet or Bird, but through Jacobson and Northwest, and not on a

"renewal" basis, but on a "replacement" transaction. This is supported by Galbraith's testimony, as well as that of James H. Collins, who testified that the act of Galbraith in going to Jacobson constituted "an altogether new insurance transaction." ▇ Moreover, Collins said that the language in Minet's letter (which consisted mostly of a printed form) to wit, "We shall be glad to have your instructions prior to expiration of the policy," required acceptance of the offered renewal to be communicated to Minet. Plaintiff's expert, George Burton, also characterized Galbraith's actions on August 31, 1959, as instituting a new insurance transaction. He testified concerning the custom and practice in the American insurance industry relative to "provisional renewals," and said that communication of acceptance of the same was required to be made to the London broker before expiration in order for a renewal of an expiring policy to be accomplished. ▇ Each party to a contract of insurance is bound to know all of the general usages of the trade. (*Guipre* v. *Kurt Hitke & Co.*, 109 Cal.App.2d 7, 14 [240 P.2d 312].) ▇ In any event, the offer to renew, as set up in the correspondence, expired August 31, 1959. (*Davies* v. *Langin*, 203 Cal.App.2d 579, 584-585 [21 Cal.Rptr. 682].)

For the foregoing reasons all judgments and the order appealed from are affirmed.

Wood, P. J., and Fourt, J., concurred.

The petition of the defendant and appellant for a hearing by the Supreme Court was denied July 13, 1966.