[Civ. No. 23252. First Dist., Div. One. June 22, 1967.]

HOME INDEMNITY COMPANY et al., Plaintiffs and Appellants, v. MISSION INSURANCE COMPANY et al., Defendants and Respondents.

944

Elke, Farella, Braun & Martel for Plaintiffs and Appellants.

Walcom & Harmon, Leo J. Walcom, Quinn, Quinn & Quinn and James H. Quinn for Defendants and Respondents.

SIMS, J.—Plaintiffs home Indemnity Company and AAA Leasing Corporation, its insured, have appealed from a judgment denying them any relief in an action in which they sought a declaration of their rights against Mission Insurance

Company, the alleged insurer of a lessee of a car from AAA, and against Thomas Clark, the agent who allegedly undertook to secure the latter insurance for the lessee.

Other parties named in the original complaint for declaratory relief were Jimmie Ray Vega, the lessee; Tower Indemnity Company, which, through Clark, issued to Vega a basic public liability policy covering $10,000/$20,000 of a total sum of $100,000/$300,000 for which Vega applied (the excess of $90,000/$280,000 was applied for with Mission); and Thomas Leland Quinlan, who suffered injuries on September 14, 1963 when struck by the leased car while it was operated by Vega; and who, on December 10, 1963, filed suit against Vega and the leasing corporation.

Mission at all times denied that it had any insurance in effect at the time of the accident. Plaintiffs commenced this action March 18, 1964. In November 1964, on the eve of the trial of the Quinlan action a settlement was negotiated for the sum of $40,000; $9,000 was paid by Tower and $31,000 by Home. Mission agreed that the settlement was reasonable, that Home was not a volunteer in making such payment and that the settlement would be without prejudice to the rights of any party in this action. In consideration of the sum paid by Tower, the plaintiffs released Tower and Vega from further liability, and dismissed this action as to them. The action was dismissed as to Quinlan at the pretrial hearing.

The case was set for trial on issues revolving about the nature and extent of the authority of Clark, the existence of and extent of any coverage afforded by Mission at the time of the accident, the existence and extent of the coverage afforded by Home at the time of the accident, and the right of Home to contribution from Mission if the latter had insurance in force.

The findings of the trial court, insofar as they are pertinent to this appeal, are as follows:

"That defendant Thomas Clark was a duly licensed insurance agent authorized and acting on behalf of the defendant, Mission Insurance Company, a corporation, and also for the Tower Indemnity Company, a corporation, to bind insurance risks and liability excess coverage. [Finding II]

"That on or about February 25, 1963, plaintiff, AAA Leasing Corporation, a corporation, leased to Jimmie Ray Vega, defendant herein, a 1963 Chevrolet Impala automobile. That under the terms of the leasing agreement, the lessee was required to furnish and supply insurance in which he and

AAA Leasing Corporation, a corporation, would be named insureds, in the sum of $100,000/$300,000 public liability, $25,000 property damage, $100 deductible collision and comprehensive insurance. That pursuant thereto Jimmie Ray Vega took possession of the vehicle from AAA Leasing Corporation and obtained insurance through Commonwealth Thrift Company with an insurance company or companies not disclosed to the record. That this insurance was cancelled, effective as of August 12, 1963. [Finding III]

"That on or about the 10th day of August, 1963, said Jimmie Ray Vega applied to Thomas Clark for insurance in the limits of $100,000/$300,000 public liability, $25,000 property damage, $100 deductible collision and comprehensive insurance. That he told defendant Thomas Clark that he was leasing the automobile from AAA Leasing Corporation, that the insurance must protect him and also the leasing corporation, that he showed his lease agreement to defendant Clark, and that defendant Clark took an application from Jimmie Ray Vega for Tower Indemnity Company for $10,000/$20,000 bodily injury, $100 deductible, $5000 property damage, and comprehensive insurance. As loss payee the Bank of Tokyo of California was named with relation to the collision and comprehensive insurance as it appeared on the registration of the Chevrolet Impala automobile to be the legal owner thereof. Jimmie R. Vega appeared on the application as the named insured. On the same day defendant Clark took an application from Jimmie R. Vega for excess insurance with Mission Insurance Company, with Jimmie R. Vega as the named insured, in the sum of $90,000/$280,000 for public liability insurance only. That defendant Clark informed defendant Vega that he was covered effectively from August 12. 1963 to August 12, 1964 in total limits of $100,000/$300,000 public liability and $25,000 property damage. That defendant Clark received at the time of the taking of the application and thereafter a total sum of $100 premium to be applied on a total premium charge of $422. [Finding IV]

"That on September 14, 1963, Jimmie R. Vega was in an accident with Thomas Leland Quinlan while operating the insured Chevrolet. That no policies had been delivered to Vega prior to the occurrence of this accident. That at all times from August 12, 1963 Jimmie R. Bega was insured by Tower Indemnity Company for $10,000/$20,000 bodily injury limits and by Mission Insurance Company in the sum of $90,000/$280,000 bodily injury limits as excess insurance.

That at no time prior to September 17, 1963 which was subsequent to the accident involving Thomas Leland Quinlan was AAA Leasing Corporation a named insured under the policy issued by Mission Insurance Company." [Finding V]

Finding VI first recites the facts concerning the Quinlan lawsuit and ensuing settlement as outlined above. It concludes: "That by the terms of the Mission excess policy it incurred no obligation unless and until the primary policy of Tower had paid or had been held to pay the sum of $10,000. That at all times mentioned herein, plaintiff, Home Indemnity Company, had issued a policy of public liability insurance to plaintiff, AAA Leasing Corporation with limits of $250,000/ $500,000 public liability bodily injury insurance.

"That at all times mentioned herein, there was no relationship of privity betweeen plaintiffs and defendant Thomas Clark." [Finding VII]

Plaintiffs make the following contentions before this court: (1) the trial court erred in holding that there was a failure to exhaust Tower's primary coverage; (2) it erred in failing to hold that AAA was an additional insured with respect to the public liability insurance issued to Vega by Mission; (3) it erred in failing to hold that Home's policy did not cover the vehicle leased to Vega; (4) it erred in failing, at the very least, to prorate the loss between Mission and Home; and (5) it erred in denying plaintiffs recovery from Clark if he in fact did not bind coverage in favor of AAA.

The facts as found and supplemented by uncontradicted evidence lead to the following conclusions which are determinative of the case:

(1) Mission furnished insurance which covered both Vega and AAA at the time of the accident and which was supplemental and excess to the Tower policy;

(2) Home's policy with endorsements purported to exclude the lessor-owner, the leased vehicle, and the lessee-user from coverage when, as was the fact, the lessee-user secured "owner's" insurance on the vehicle pursuant to his contract with the lessor-owner. No law or decision is found prohibiting the exclusion of vehicles from coverage under such circumstances, or rendering the provisions void because of a limitation on the liability insurance furnished a lessee-user when he is not obligated to or fails to secure such insurance. Final resolution of those issues is rendered unnecessary by the determination that the coverage, if any, furnished by Home would be excess;

(3) The relative coverage of Tower and Home being pro-rate and excess, the Tower insurance is primary and when exhausted is followed by the Mission coverage;

(4) The compromise between Tower, Vega, Home and Quinlan does not affect the liability of Mission which accrued at the time of loss, and Home is entitled to reimbursement of $30,000 from Mission;

(5) The agent is relieved of any liability by the adjudication that his disclosed principal is liable.

## Mission's Coverage

Mission insisted from the outset that at the time of the accident it had no liability insurance in force which covered Vega or anyone else. This contention was predicated on the theory that any insurance originally granted expired September 5, 1963.

Following the receipt of the application, Mission's underwriting agent on August 22, 1963 wrote Clark, "Please let me know the Company, the policy period, policy number, and type of policy which is written for primary coverage. We must write our policy to expire concurrently with the primary policy. If we do not hear from you by 9/5/63, we will assume that you do not wish an annual policy and will issue a short-term policy from 8/12/63 to 9/5/63."

According to one of Mission's clerks, no reply was received to this inquiry prior to September 19th. At some time after September 5th, and prior to September 17th, a coding sheet and the application, modified to show a termintaion date of 9/5/63 rather than 8/12/63, were sent to a typing service for the preparation of a policy. This short term policy was countersigned and issued September 17, 1963, and apparently mailed to Clark on September 20th.

Clark testified that he had given Mission the name of the primary insurer, Tower, and had requested and had received two 10-day extensions within which to furnish the complete information. On September 17th he sent Mission the Tower policy number. This communication was received by Mission on the 19th, and his memorandum was returned to him on the 23d with advice that, if coverage other than the short term policy was desired, he would have to submit a new application.

Thereafter Clark commenced negotiations by phone to secure the annual policy requested in the original application. In the course of these negotiations he returned to the underwriter the short term policy and his memorandum of Septem-

ber 17th, as endorsed on the 23d. He also revealed in the telephone conversations that a loss had occurred on September 14th. These negotiations culminated on October 18th. The underwriters returned the short term policy to Clark and on October 23, 1963 issued a second policy which granted the excess insurance for the period from September 17, 1963 to August 12, 1964.

The evidence shows that it was the practice of Mission to bind the coverage for new business from the date of the post-mark on the envelope in which the application was contained, or from a later date if requested; that it was customary for the employees of the underwriter to give extensions of time as a matter of courtesy; and that a written record was not always made of such extensions. No notice was given Vega prior to the accident that he was not covered in full as he had requested, and Clark did not receive any notification that Mission did not want to handle the particular risk.

 On the foregoing evidence and the facts as recited in Finding "IV" the trial court properly held: "That at all times from August 12, 1963 Jimmie R. Vega was insured by Tower Indemnity Company for $10,000/$20,000 bodily injury limits and by Mission Insurance Company in the sum of $90,000/$280,000 bodily injury limits as excess insurance." (*Cline* v. *Atwood* (1966) 241 Cal.App.2d 108, 112 [50 Cal. Rptr. 233]; *Financial Indem. Co.* v. *Murphy* (1963) 223 Cal.App.2d 621, 627 and 628-631 [35 Cal.Rptr. 913]; *Guipre* v. *Kurt Hitke & Co.* (1952) 109 Cal.App.2d 7, 15-16 [240 P.2d 312]; and see *Skyways Aircraft Ferrying Service, Inc.* v. *Stanton* (1966) 242 Cal.App.2d 272, 280-283 [51 Cal.Rptr. 352]; and *Parlier Fruit Co.* v. *Fireman's etc. Ins. Co.* (1957) 151 Cal.App.2d 6, 18-20 and 27 [311 P.2d 62].)

By appropriate objections to the findings and by proposed additional and counter-findings plaintiffs sought a determination that Clark bound Mission to public liability insurance which covered not only Vega, but also AAA as an additional insured. Nevertheless, the trial court found that "at no time prior to September 17, 1963 . . . was AAA . . . a named insured *under the policy issued by Mission.. . . .*" (Italics added.)

The last finding is ambiguous. The evidence shows that no policy was issued by Mission until September 17th, and the findings correctly set forth: "That no policies had been delivered to Vega prior to the occurrence of this accident."

Plaintiffs contend that the evidence compels the finding

that AAA was expressly insured as an additional insured at the time of loss. Clark testified that his experience in writing insurance with Mission was that, by indicating that a person other than the applicant was the owner of the car, an additional interest endorsement would issue for the owner; and that with this purpose in mind he inserted "AAA Leasing Corp. San Francisco" in the appropriate place on the application. On the same day Clark wrote AAA that $100,000/$300,000 liability had been written. The letter did not, however, mention Mission.[1]

, A clerk who was employed as an underwriter in the office of Mission's operating agent in San Francisco, and who participated in some of the transactions with Clark concerning Vega's insurance, testified that it was the custom of the company to issue an additional interest endorsement where the application indicated that (except for the loss payee for collision and theft) the applicant was not the sole owner of the car; and that the application submitted by Clark on behalf of Vega indicated that AAA was to be named as an additional insured.

On the other hand, the manager of Mission's automobile department, who signed the policies which Mission ultimately issued after the loss had occurred, testified that the original application was made on the wrong form—one for primary insurance rather than for excess insurance; that the request for designation of the owner of the car when other than the applicant or a named loss payee, as indicated on the application form for primary insurance, was for use in connection with claims for material damage loss; that a person was added in a policy as an additional insured by request and by endorsement such as was attached to the second policy issued by Mission; and that no such endorsement was in effect on the date of the loss. He acknowledged, however, that a notation such as that contained on the original application would initiate inquiry as to what was intended, and that if it was requested that a leasing company be an additional insured, the company would comply and put the lessor on the policy.

The record further indicates that the application form for

---

[1] The letter reads: "Effective *8-12-63* coverage was written with the Tower Ins. Co. on the above *name* [Vega] for Comprehensive Fire and Theft ACV and for *100* deductible Collision *and 100-300 Liability*.

"Loss Payee has been issued in your favor and a copy of the policy with appropriate Endorsements will be forwarded to you as soon as they are received in this Office." (Underscoring indicates handwriting inserted in form letter.)

the second policy issued by Mission was filled out in its office from information from the original application. It bears the notation "ADDT'L INS., AAA LEASING CORP S.F." The second policy was issued with an appropriate endorsement covering AAA as an additional interest insured. Counsel's statement that Clark requested an additional interest endorsement following the accident,[2] does not contradict the agent's testimony that such coverage was intended from the outset. (See finding IV, *supra*.)

If it be assumed that a policy had been issued prior to loss without naming AAA as an additional insured, Vega would have been entitled to have had it reformed to conform to the mutual intention of the applicant and the authorized soliciting agent of the insurer. The insurance company, and not the applicant, is charged with the agent's error, if any, in the selection of and completion of the application blank. (See *Bankers Indem. Ins. Co.* v. *Industrial Acc. Com.* (1935) 4 Cal.2d 89, 91-93 [47 P.2d 719]; *Modica* v. *Hartford Acc. & Indem. Co.* (1965) 236 Cal.App.2d 588, 595-596 [46 Cal.Rptr. 158]; *Beach* v. *United States Fid. & Guar. Co.* (1962) 205 Cal.App.2d 409, 413-418 [23 Cal.Rptr. 73]; *American Surety Co.* v. *Heise* (1955) 136 Cal.App.2d 689, 694-697 [289 P.2d 103]; *Eagle Indem. Co.* v. *Industrial Acc. Com.* (1949) 92 Cal.App.2d 222, 224-226 [206 P.2d 877]; *Cantlay* v. *Olds & Stoller Inter-Exchange* (1932) 119 Cal.App. 605, 617-618 [7 P.2d 395]; and Annotation, 1 A.L.R.3d 88.)

The trial court further found: "That at all times mentioned herein, there was no relationship of privity between plaintiffs and defendant Thomas Clark." If this finding refers to a direct contractual relationship, it is correct. It cannot, however, be sustained to contradict the unimpeached evidence that plaintiff AAA was the express third party beneficiary of a contract made by Vega with Clark, as Mission's

---

[2]The court's finding is apparently predicated upon the following colloquy: "Q. [Attorney for Mission] . . . when the second policy . . . was issued, . . . did you not request that an endorsement be placed upon that policy naming AAA as an additional interest? A. [Clark] ·I believe so, yes. . . . Q. And that was the manner in which, in the event that one wished to have any additional interest on the policy, it would be done by request for form of additional interest of endorsement to name such a person? A. Yes. THE COURT: What was the date of that request? [Attorney]: It was following the accident. THE COURT: In any event, it was after the accident? [Attorney]: Yes, after the accident. Q. Was it not, Mr. Clark? A. Yes, those [?] came in after the accident. THE COURT: What is the effective date of it? [Attorney]: 9/17/63 to 8/12/63. THE COURT: All right."

agent, in order to provide liability insurance for AAA. Nor can this finding prevent an estoppel arising on the basis of Clark's letter to AAA advising it that Vega had secured the coverage he had contracted to obtain. Although the letter only mentions Tower as an insurer, it is obvious that Clark's representation was made in the capacity of agent for each of the insurers with which he placed the coverage.

It is clear that AAA, as the entity whose interest was to be protected, would have been entitled to have any policy which omitted it reformed. (*Beach* v. *United States Fid. & Guar. Co., supra,* 205 Cal.App.2d 409, 417; *Cantlay* v. *Olds & Stoller Inter-Exchange, supra,* 119 Cal.App. 605, 614-617; and see *Orcutt* v. *Ferranini* (1965) 237 Cal.App.2d 216, 223-224 [46 Cal.Rptr. 715].)

In this case no policy was ever issued prior to the loss. ▮ The court in the exercise of its equitable powers should have given effect to the true intention of the parties in determining the nature of the contract formed by the application and the insurer's acceptance of it. (*Beach* v. *United States Fid. & Guar. Co., supra,* 205 Cal.App.2d 409, 418.) The trial court erred insofar as it failed to find and conclude that AAA was covered by Tower[3] and Mission at the time of the loss.

*Home's Coverage*

The policy issued by Home to AAA purports to be a Comprehensive Liability Policy separately covering bodily injury and property damage under the headings "Automobile" and "Except Auto."

Mission had asserted at oral argument that, in addition to the coverages under the heading "Automobile," "Coverage B—Bodily Injury Liability—Except Automobile" also applied to the loss in question, because of the reference to automobiles in an exclusion from that coverage. The policy recites: "This policy does not apply: . . . (d) under coverages B and D, except with respect to operations performed by independent contractors . . . to the ownership, maintenance, operation, use, loading or unloading of . . . automobiles if the accident occurs away from such premises or the ways immediately adjoining, . . ."

In *Pacific Employers Ins. Co.* v. *Maryland Cas. Co.* (1966) 65 Cal.2d 318 [54 Cal.Rptr. 385, 419 P.2d 641], the insurer

---

[3] Although Tower has been dismissed from this action (see discussion *infra*) there is nothing to preclude the court from adjudicating as against Mission the extent of the rights and obligations of Tower at the time of the accident.

conceded that language identical with that quoted above covered "the use of automobiles where liability arises out of operations performed by an independent contractor, or on the premises or ways immediately adjoining." (65 Cal.2d at p. 324.) The insurer nevertheless urged that its policy was a general comprehensive liability policy and not an automobile or motor vehicle policy, and that the extension of the coverage to permissive users and the prohibition on the geographical limitation of the coverage, which are both imposed by law, were not applicable. The court concluded: "In construing the policy in light of this phrase [" 'ways immediately adjoining' the insured's premises"] we do not deem it relevant that the policy be categorized as an 'automobile' or any other type policy. The label is unimportant. What is important is whether the policy, whatever its label, provides liability coverage to automobiles while operated on a public highway. If so, then the carrier has exposed itself to the application of the *Wildman* principle by purporting to furnish the crucial coverage." (*Id.*, p. 325.)

The automobile financial responsibility law is "designed to give monetary protection to that ever changing and tragically large group of persons who while lawfully using the highways themselves suffer grave injury through the negligent use of those highways by others." (*Continental Cas. Co.* v. *Phoenix Constr. Co.* (1956) 46 Cal.2d 423, 434 [296 P.2d 801, 57 A.L.R.2d 914].) The implementation of this policy warrants the proliferation of the coverage granted by a general comprehensive liability policy which was authorized in the case last cited. Where, however, the policy purports to cover automobile liability in one part and general liability in another the application of the same principles to the latter coverage serves to rewrite the policy to the exclusion of the specific provisions which are applicable to the automobile coverage. No authority is found for such a procedure. In fact the other policies involved in the *Pacific Employers* case were, as is the Home policy here, multiple coverage policies (see *Pacific Employers Ins. Co.* v. *American Mut. Liab. Ins. Co.* (Cal.App. 1966) 50 Cal.Rptr. 414 at pp. 421-422). The Supreme Court in its opinion did not attempt to evaluate the automobile coverage that might be available under the provisions of those policies which were not labeled "automobile," and there is no warrant for such circumforaneous analysis in this case.

The insurer undertook: "Coverage A—Bodily Injury Lia-

bility—Automobile: To pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of bodily injury, sickness or disease, including death at any time resulting therefrom, sustained by any person, . . . and arising out of the ownership, maintenance or use of any automobile.'' The policy limits for this liability were fixed at $250,000/$500,000.

The definition of insured under the foregoing coverage included ''any person while using an owned automobile . . . and any person . . . legally responsible for the use thereof, provided the actual use of the automobile is . . . with [''the named insured [']'' permission, . . .''

By ''Garage'' endorsement to the policy (''#6'') the insured declared: ''All automobiles owned by the named insured are used principally in garage operations of the named insured'' with the exceptions not material to this case. The definitions contained in this endorsement excluded ''any automobile . . . while rented to others by the named insured. . . .''

By ''Rental Endorsement'' (''#8'') the insurer acknowledged that the principal coverage would apply while automobiles owned by the insured were rented to others. It purports to limit the bodily injury liability for others than the named insured to $10,000/$20,000.[4]

An ''Uninsured Leased Automobile'' endorsement (''#10'') expressly extends the principal bodily injury liability coverage to ''uninsured leased private passenger automobiles that

[4]Endorsement #8 reads:

''RENTAL ENDORSEMENT

In consideration of an additional premium to be determined on audit, it is agreed that such insurance as is afforded by the policy under Coverage A—Bodily Injury Liability—Automobile and Coverage C—Property Damage Liability—Automobile, applies with respect to the automobiles insured under the policy, as defined in endorsement AL 8524c, Garage (Premises—Operations—Automobiles) subject to the following additional provisions:
1. The insurance applies while the automobiles are rented without the named insured or a chauffeur of the named insured in attendance.
2. While the automobiles are so rented the insurance applies only to the named insured and the rentee, and while used for business purposes of the rentee, any employer or employee of the rentee.
3. The limits of liability for the insurance afforded by this endorsement for all persons or organizations, other than the named insured, are as set forth below.
Coverage A $10,000.00 each person
 $20,000.00 each occurrence
Coverage C $ 5,000.00 each accident
The insurance afforded herewith shall be excess insurance over any other valid and collectible insurance.''

are leased under long term contract of not less than twelve (12) months.'' It purports to limit bodily injury liability coverage for the lessee to $10,000/$20,000.[5]

Home contends that the garage endorsement withdrew all coverage for both the lessor (AAA, its insured) and the lessee (Vega) with respect to any vehicle leased by AAA to another; and that by endorsement #10 such coverage was restored in full to the lessor and to the extent of the statutory minimum (Veh. Code, § 16451) for the lessee in the event the leased automobile was otherwise uninsured. Home asserts that endorsement #8 was written to provide similar coverage for all owned automobiles which were rented for less than one year; and that it is not applicable to the automobile involved. It concludes that since the leased automobile involved in the accident was leased for twelve months and was insured by Vega's insurance with Tower and Mission, it was not covered by Home's policy at the time of the accident.[6]

---

[5]Endorsement #10 reads:

"UNINSURED LEASED AUTOMOBILES

In consideration of the premium charged it is agreed that Coverage A—Bodily Injury Liability—Automobile and Coverage C—Property Damage Liability—Automobile, are extended to include coverage for uninsured leased private passenger automobiles that are leased under long term contract of not less than twelve (12) months and subject to the following limits of liability for the lessee only:

Coverage A $10,000.00 each person
 $20,000.00 each occurrence
Coverage C $ 5,000.00 each accident

It is further agreed that:
1. As respects Garage Endorsement (Premises—Operations—Automobiles) the words under A. Hazard Defined (1) 'Any automobile while rented to others' do not apply as respects the insurance afforded by this endorsement.
2. Such insurance as is afforded under this endorsement shall be excess insurance over any other valid and collectible insurance.
3. The below specified physical coverages also apply to the automobiles described above.
4. As respects automobiles leased under long term contract of not less than twelve (12) months, to other persons or organizations. It is agreed that the named insured will furnish to the company a certificate of automobile liability and physical damage insurance within sixty (60) days of date of lease.''

[6]The trial court properly rejected plaintiffs' offer of proof respecting the intent of AAA, its insurance broker, and Home, that insured leased vehicles were not intended to be covered by Home's policy and Home received no premium therefor. Whatever relevancy such evidence might have on the relationship between AAA and Home, it could not affect the rights and obligations of Quinlan, Vega, Tower or Mission as they were established in reference to Home's contract as written and as in effect at the time of the accident. (See *McConnell* v. *Underwriters at Lloyds of London* (1961) 56 Cal.2d 637, 645 [16 Cal.Rptr. 362, 365 P.2d 418]; *Pacific Indem. Co.* v. *Liberty Mut. Ins. Co.* (1966) 239 Cal.App.2d 346,

The court's finding (finding VI, *supra*) that "at all times mentioned herein, . . . Home . . . had issued a policy of public liability insurance to . . . AAA . . . with limits of $250,000/$500,000 public liability bodily injury insurance" apparently implies that such insurance was in effect and available at the date of the accident to pay any damages which Quinlan might be awarded against either AAA or Vega. Plaintiffs filed timely objections to this finding and proposed findings in accordance with their suggested interpretation of the Home policy.

Mission's argument in support of the findings of the trial court is twofold. It contends that the policy provisions, including the endorsements, do not expressly qualify the broad coverage extending to liability "arising out of the ownership . . . of *any* automobile," and, secondly, that if the endorsements should be so construed they are invalid because they contravene public policy.

In determining how the contract should be read the following rules apply: "Although if there is any ambiguity in an insurance policy it must be resolved against the insurer [citations], nevertheless if there is a conflict in meaning between an endorsement and the body of the policy, the endorsement controls. [Citations.] Likewise, under the provisions of section 1651 of the Civil Code, [fn. omitted] the written or specially prepared portions of a contract control over those which are printed or taken from a form. The provisions of the two endorsements, as quoted above, are typewritten, while, as already mentioned, the insuring agreements are part of the printed policy form." (*Continental Cas. Co.* v. *Phoenix Constr. Co., supra*, 46 Cal.2d 423, 430-431; and see *McConnell* v. *Underwriters at Lloyds* (1961) 56 Cal.2d 637, 640 [16 Cal.Rptr. 362, 365 P.2d 418].)

In order to give effect to the endorsements on the policy it is necessary to accept and confirm plaintiffs' interpretation. If "any automobile" is to be considered as referring unqualifiedly, without regard to the other terms of the policy, to any automobile owned, maintained, or used by AAA, it was idle for the parties to enter into the agreements manifested by the endorsements on the policy. The endorsement to cover "Uninsured Leased Automobiles" (fn. 5, *supra*) clearly demonstrates that the parties contemplated and agreed that automobiles leased for not less than twelve months which were

351. [48 Cal.Rptr. 667]; and *Fullerton* v. *Houston Fire & Cas. Ins. Co.* (1965) 234 Cal.App.2d 743, 747 [44 Cal.Rptr. 711].)

otherwise insured were not to be insured by Home. The "Rental Endorsement" (fn. 4, *supra*), would appear to render the former endorsement superfluous—because it would render all rented vehicles insured—unless, as construed with the former provision, it is considered as applying to vehicles rented for periods of less than one year. The need for extension of coverage to each of these classes of rented and leased vehicles is evidenced by the provisions of the garage endorsement (#6) which removes such vehicles from the coverage of the policy.

The question is whether or not the vehicle was covered at the time of the accident. ■ An insurer may refuse to cover a particular vehicle and, if the insurance does not cover the particular loss, the insurer cannot be forced to contribute. (*Fullerton* v. *Houston Fire & Cas. Ins. Co.* (1965) 234 Cal. App.2d 743, 750-752 [44 Cal.Rptr. 711] ; *United Services Auto Assn.* v. *Fidelity & Cas. Co.* (1964) 225 Cal.App.2d 573, 577 [37 Cal.Rptr. 583] ; and see *Continental Cas. Co.* v. *Phoenix Constr. Co., supra,* 46 Cal.2d 423, 430-432.)

Mission insists that the policy of the State Financial Responsibility Law (Veh. Code, §§ 16430-16487) as construed by the courts prohibits the restrictive coverage attempted by Home. Plaintiffs acknowledge that if the Vega vehicle was, in fact, covered by the Home policy, the liability insurance thereby furnished the owner must by law be extended, in such sum as is properly applicable, to Vega as a permissive user. (See *Pacific Employers Ins. Co.* v. *Maryland Cas. Co., supra,* 65 Cal.2d 318, 324-325; *Atlantic Nat. Ins. Co.* v. *Armstrong* (1966) 65 Cal.2d 100, 104-106 [52 Cal.Rptr. 569, 416 P.2d 801] ; *Exchange Cas. & Surety Co.* v. *Scott* (1961) 56 Cal.2d 613, 622-624 [15 Cal.Rptr. 897, 364 P.2d 833] ; *Universal Underwriters Ins. Co.* v. *Aetna Ins. Co.* (1967) 249 Cal.App. 2d 144, 148-150 [57 Cal.Rptr. 240] ; *Travelers Indem. Co.* v. *Colonial Ins. Co.* (1966) 242 Cal.App.2d 227, 232-233 [51 Cal.Rptr. 724] ; *Clark* v. *Universal Underwriters Ins. Co.* (1965) 233 Cal.App.2d 746, 748 [43 Cal.Rptr. 822] ; *Pacific Indem. Co.* v. *Universal etc. Ins. Co.* (1965) 232 Cal.App.2d 541 [43 Cal.Rptr. 26] ; *Financial Indem. Co.* v. *Hertz Corp.* (1964) 226 Cal.App.2d 689, 697 [38 Cal.Rptr. 249] ; *Bohrn* v. *State Farm etc. Ins. Co.* (1964) 226 Cal.App.2d 497, 501-504 [38 Cal.Rptr. 77] ; *Globe Indem. Co.* v. *Universal Underwriters Ins. Co.* (1962) 201 Cal.App.2d 9, 12-16 [20 Cal.Rptr. 73] ; *Bonfils* v. *Pacific Auto. Ins. Co.* (1958) 165 Cal.App.2d 152, 156-158 [331 P.2d 766].)

Plaintiffs insist that the question is not one of evading responsibility for a permissive use of an owned insured automobile, but one where the facts show that the vehicle in question was not insured at all by Home, even to the extent of covering the owner's liability under sections 17150 and 17151 of the Vehicle Code.

█ It is unnecessary to determine whether public policy would prevent excluding a vehicle of a particular class under circumstances when provision has been made for other "owner's" insurance on the vehicle. (Cf. *Interinsurance Exchange* v. *Ohio Cas. Ins. Co.* (1962) 58 Cal.2d 142, 145-146 [23 Cal. Rptr. 592, 373 P.2d 640]; *American Auto. Ins. Co.* v. *Republic Indem. Co.* (1959) 52 Cal.2d 507, 510 [341 P.2d 675]; *Clark* v. *Universal Underwriters Ins. Co., supra,* 233 Cal.App.2d 746, 748; *Pacific Indem. Co.* v. *Universal etc. Ins. Co., supra,* 232 Cal.App.2d 541, 543; and *Royal Exchange Assur.* v. *Universal Underwriters Ins. Co.* (1961) 188 Cal.App.2d 662 [10 Cal.Rptr. 686], with *Continental Cas. Co.* v. *Phoenix Constr. Co., supra,* 46 Cal.2d 423, 432; and see *Fullerton* v. *Houston Fire & Cas. Ins. Co., supra,* 234 Cal.App.2d 743, 750-752; and *United Services Auto Assn.* v. *Fidelity & Cas. Co., supra,* 225 Cal.App.2d 573, 577.) Nor is it necessary to determine the validity of plaintiffs' attempt to limit the coverage afforded a lessee-user when the vehicle was not otherwise insured. (See *United States Fire Ins. Co.* v. *Transport Indem. Co.* (1966) 244 Cal.App.2d 110, 117-119 [52 Cal.Rptr. 757]; *General Ins. Co.* v. *Truck Ins. Exchange* (1966) 242 Cal.App.2d 419, 425 [51 Cal.Rptr. 462]; *Travelers Indem. Co.* v. *Colonial Ins. Co., supra,* 242 Cal.App.2d 227, 242; *Clark* v. *Universal Underwriters Ins. Co., supra,* 233 Cal.App.2d 746, 748-749; *Pacific Indem. Co.* v. *Universal etc. Ins. Co., supra,* 232 Cal. App.2d 541, 543; *Financial Indem. Co.* v. *Hertz Corp.. supra,* 226 Cal.App.2d 689, 698; *Globe Indem. Co.* v. *Universal Underwriters Ins. Co., supra,* 201 Cal.App.2d 9, 16-18; and cf. Ins. Code, § 11580.1 as added Stats. 1963, ch. 1259, § 1, p. 2780, and amended Stats. 1965, ch. 1968, § 1, p. 4496.)

If, in any event, the insurance provided by Home would be excess to that furnished by the Tower-Mission policies, determination of the question of the existence of such insurance is unnecessary because the loss is embraced within the prime coverage.

In *American Motorists Ins. Co.* v. *Underwriters at Lloyd's London* (1964) 224 Cal.App.2d 81 [36 Cal.Rptr. 297], the defendant had issued to the owner-renter basic insurance

covering $5,000 personal injury liability which expressly covered permissive users, and two excess policies which excluded any coverage to rentees. The court found that there was other insurance covering the rentee, which, with the basic policy, was more than sufficient to cover the loss. The validity of the restrictive coverage was therefore left undetermined (224 Cal.App.2d at p. 87). In holding that the owner's insurer did not necessarily have to provide primary insurance to permissive users, and could make the coverage excess as to other than the additional insured, the court observed: "To construe the Underwriters' policy as giving primary coverage to Snyder, in the face of its express language to the contrary, is not compelled by any of these earlier cases. Each of them expressly notes the absence of any specific language establishing classes of coverage; in fact, in *Globe Indem. Co.* v. *Universal Underwriters Ins. Co., supra,* (1962) 201 Cal.App. 2d 9, at page 17, the court bases its decision, in part, on the fact that the insurer had not indicated an intention to do other than to cover all insureds in an equal fashion." (*Id.* at p. 86.)

*Relative Coverage*

Before turning to the effect of the postaccident activities of the principals and their insurers, it is necessary to determine their respective rights and obligations as they existed at the time of the accident. (See *Air etc. Co.* v. *Employers' Liab. etc. Corp.* (1949) 91 Cal.App.2d 129, 131 [204 P.2d 647].)

If Home's interpretation of its policy is accepted as outlined above, it offered no coverage to either AAA or Vega, and Tower and Mission were the only insurers furnishing insurance for the loss. No question of relative coverage then arises.

AAA bargained with and received from Home a policy which purportedly excluded cars leased for a period of a year or more if otherwise insured, and undertook to provide insurance for such vehicles. Pursuant to the latter undertaking, it bargained with and received from Vega his undertaking to secure such insurance for himself and AAA. Vega in fulfillment of his obligation bargained with Tower and Mission, through Clark, for such insurance; and, as has been herein determined, he and AAA became entitled to such coverage as a result of those negotiations. If public policy should require the elimination or modification of the contractual provisions

between AAA and Home, under which the latter seeks to exempt itself from and limit its liability, they should be modified to provide protection at the higher limits and not at the basic level.

There is nothing in the policy provisions or existing precedents to preclude the foregoing analysis. No automobile liability insurance cases have been cited or found where the lessee-operator undertook to secure, and did secure "owner's" insurance on the specific leased car for the benefit of himself and the lessor, as distinguished from situations where the lessee-operator's insurance consisted of a provision for indemnity for operation of a nonowned vehicle without reference to the specific vehicle leased in an "owner's" or "comprehensive" liability policy issued to the lessee. (Cf. *Meritplan Ins. Co.* v. *Universal Underwriters Ins. Co.* (1966) 247 Cal.App.2d 451, 457 [55 Cal.Rptr. 561].)

The other insurance clause in the general conditions of the Home policy reads as follows: "If the insured has other insurance against a loss covered by this policy the company shall not be liable under this policy for a greater proportion of such loss than the applicable limit of liability stated in the declaration bears to the total applicable limit of liability of all valid and collectible insurance against such loss; provided, however, the insurance under this policy with respect to loss arising out of the maintenance or use of any hired automobile insured on a cost of hire basis or the use of any non-owned automobile shall be excess insurance over any other valid and collectible insurance.

"The insurance under this policy shall be excess insurance with respect to loss against which the named insured has other insurance disclosed to the company as in effect on the effective date of this policy and upon the basis of which premium credit for other insurance is given but shall apply only in the amount by which the applicable limit of liability stated in the declarations exceeds the total applicable limits of liability of all valid and collectible insurance upon the basis of which premium credit is given."

The other insurance clause in the Home garage endorsement contains a prorate clause similar to the foregoing language. It does not have a proviso for nonowned vehicles, but continues: "The above provision shall not apply with respect to other insurance stated to be applicable to the loss only as excess insurance over any other valid and collectible insurance or on a contingent basis."

The rental endorsement (#8, fn. 4, *supra*) states: "The insurance afforded herewith shall be excess insurance over any other valid and collectible insurance"; and the uninsured leased automobile endorsement (#10, fn. 5, *supra*) similarly provides: "Such insurance as is afforded under this endorsement shall be excess insurance over any other valid and collectible insurance."

A reading of all the terms of the policy indicates an obvious and expressed intention that whatever insurance was to be furnished the operators of vehicles leased or rented by the insured was to be excess. If a paramount and preponderating public policy should strike down the provisions which purport to eliminate the coverage of leased vehicles which are otherwise insured, or the provisions which purport to limit the amount of insurance furnished the permissive users of such vehicles, it does not further require that the excess provision be stricken. (*American Motorists Ins. Co.* v. *Underwriters at Lloyd's London*, *supra*, 224 Cal.App.2d 81, 86; and see *Wilshire Ins. Co.* v. *Transit Cas. Co.* (1967) 248 Cal.App.2d 719, 724-725 [56 Cal.Rptr. 861]; and cf. *Bohrn* v. *State Farm etc. Ins. Co.*, *supra*, 226 Cal.App.2d 497, 506-507.)

It is concluded that Home's policy, if it furnishes any coverage at all, is excess insurance.

Tower's policy, though allegedly not received until after the accident, bears an issue date of August 19, 1963. Mission has conceded that it "extended primary limits of $10,000 to Vega, and by its terms insured AAA for its legal liability as an owner." The other insurance clause in this policy provides: "If the insured has other insurance against a loss covered by Parts I, . . . [bodily injury liability and property insurer's liability] of this policy, the Company shall not be liable for a greater proportion of such loss than the applicable limit of liability stated in the declarations bears to the total applicable limit of liability of all valid and collectible insurance against such loss; except, the insurance with respect to a newly acquired automobile does not apply to any loss against which the named insured has other valid and collectible insurance." It is unquestionably a prorate provision.

Mission issued no policy prior to the accident. As has been demonstrated it was obligated to issue a policy insuring Vega and AAA. It has been assumed by the parties that the insurance so furnished would be subject to the same terms and conditions contained in the two policies which were subse-

quently issued by Mission. The law should apparently make a similar assumption. (See *Parlier Fruit Co.* v. *Fireman's etc. Ins. Co., supra,* 151 Cal.App.2d, 6, 21.)

Mission's policy contains no other insurance clause as such. By its insuring agreement "the Company agrees to indemnify the Insured [Vega and AAA], in accordance with the applicable insuring agreements of the Primary Insurance [Tower], against *excess loss* subject to the limits stated [$90,000/ $280,000] . . . and as fully and to all intents and purposes as though the Primary Insurance had been issued for the limits set forth [$100,000/$300,000]. This policy shall apply . . . only in excess of the . . . amount as set forth [$10,000/ $20,000], provided always that it is expressly agreed that liability shall attach to the Company only after the Primary insurers have paid or have been held liable to pay the full amount of their respective underlying limits as stated [$10,000/$20,000], the Company shall then be liable to pay only such additional amount as will provide the Insured with the total limits as stated [$100,000/$300,000]." (Italics added.)

The definitions set forth: "The words '*excess loss*' shall be understood to mean the sums paid in settlements of losses for which the Insured is liable after making deductions for all other recoveries, salvages and *other insurance* (including the policy/ies of the Primary Insurer), whether recoverable or not, and shall exclude all costs." (Italics added.)

Under "Conditions" appears the recital: "It is agreed that this policy, except as herein stated, is subject to all conditions, agreements and limitations of and shall follow the Primary insurance named and indicated [Tower] in all respects, . . ."

Mission asserts that the provisions of its policy render it excess as to any other insurance covering the loss, and that any indemnity furnished by Home, as well as the $10,000 furnished by Tower, must be exhausted before Mission can be called upon to contribute. (See *McConnell* v. *Underwriters at Lloyds of London, supra,* 56 Cal.2d 637, 646; *Peerless Cas. Co.* v. *Continental Cas. Co.* (1956) 144 Cal.App.2d 617, 623-626 [301 P.2d 602]; *Oil Base, Inc.* v. *Transport Indem. Co.* (1956) 143 Cal.App.2d 453, 466-470 [299 P.2d 952]; and *Lamb* v. *Belt Cas. Co.* (1935) 3 Cal.App.2d 624, 632-634 [40 P.2d 311]; and cf. *Fireman's Fund Indem. Co.* v. *Prudential Assur. Co.* (1961) 192 Cal.App.2d 492, 497 [13 Cal.Rptr. 629].)

In *McConnell* the contention that the liability of the contractual excess insurance would not apply until both the other insurance and the prime insurance were exhausted was not contested. Both those policies provided for prorating the loss. (56 Cal.2d at p. 646.) The remaining cases are set forth and analyzed in *Fireman's Fund Indem. Co.* v. *Prudential Assur. Co., supra,* wherein the court concluded: "These cases require the primary insurers to prorate the loss; they hold that the excess insurance over the primary policies does not come into play until after the exhaustion of the primary insurance. In our case, however, Maryland [the prime insurer] could not properly urge proration with Fireman's [the other insurer]. Upon the exhaustion of Maryland's limits, the policy provided, as we have shown, that the Prudential policy attached" (192 Cal.App.2d at p. 498). The court affirmed a declaratory judgment which gave effect to the excess clause of the other insurance of the lessee over the combined prime and excess coverage of the owner.

Inquiry is, therefore, directed to the relationship between Tower and Home. It appearing that Tower is prorate and Home is excess, the case last cited should govern and Home cannot be called upon for contribution, if it does afford coverage, until both Tower's and Mission's coverage is exhausted.

The fact that the Home coverage, if any, is that of the owner does not compel a different result.

"It is established law that where the owner's policy (as does the Aetna policy here) provides proration and the user's policy or the policy of one legally responsible for the use of the vehicle (as does the Universal policy here) provides excess coverage as to nonowned vehicles, the excess provision is given effect and the owner's policy is held to provide primary coverage. (*American Automobile Insurance Co.* v. *Republic Indemnity Co.,* 52 Cal.2d 507, 511-513 [341 P.2d 675].)" (*Universal Underwriters Ins. Co.* v. *Aetna Ins. Co., supra,* 249 Cal.App.2d 144, 152; *accord*: *Miller* v. *Western Pioneer Ins. Co.* (1965) 237 Cal.App.2d 138, 142-145 [46 Cal, Rptr. 579]; *Bohrn* v. *State Farm etc. Ins. Co., supra,* 226 Cal. App.2d 497, 506; *Royal Exchange Assur.* v. *Universal Underwriters Ins. Co., supra,* 188 Cal.App.2d 662, 667; *Fireman's Ins. Co.* v. *Continental Cas. Co.* (1959) 170 Cal.App.2d 698, 705 [339 P.2d 602].)

Nevertheless, it is generally recognized that there is no law or public policy which precludes the insurer of the owner from providing that its insurance shall be excess. Where the

owner's policy, as well as the user's policy, has an excess clause, the rule last stated is not followed and the loss is prorated between the insurers. (*General Ins. Co.* v. *Truck Ins. Exchange, supra,* 242 Cal.App.2d 419, 424-425; *American Motorists Ins. Co.* v. *Underwriters at Lloyd's London, supra,* 224 Cal.App.2d 81, 87; *Farmers Ins. Exchange* v. *Continental Nat. Group* (1963) 213 Cal.App.2d 91, 95 [28 Cal.Rptr. 613]; *Continental Cas. Co.* v. *Hartford Acc. & Indem. Co.* (1963) 213 Cal.App.2d 78, 84-88 [28 Cal.Rptr. 606]; *Athey* v. *Netherlands Ins. Co.* (1962) 200 Cal.App.2d 10, 12-16 [19 Cal.Rptr. 89].)

It has been held that where there is an excess clause in one policy and a prorate clause in another policy covering the same risk, the latter can only be considered as covering a pro rata share of the loss, and the former must contribute the balance. (*American Auto. Ins. Co.* v. *Seaboard Surety Co.* (1957) 155 Cal.App.2d 192, 198-199 [318 P.2d 84]; and see *Colby* v. *Liberty Mut. Ins. Co.* (1963) 220 Cal.App.2d 38, 46-47 [33 Cal.Rptr. 538]; *Truck Ins. Exchange* v. *Torres* (1961) 193 Cal.App.2d 483, 489-490 [14 Cal.Rptr. 408].)

In the case first cited the court noted: "If Republic [lessor] had a right to indemnification from Kaufman [lessee] the Continental case [*Continental Cas. Co.* v. *Phoenix Constr. Co., supra,* 46 Cal.2d 423, 429], would be controlling. The fact that this right arose from agreement rather than tort would be immaterial. One who has a superior equity growing out of contract may enforce it by way of subrogation although that contract was made with a third party. [Citations.]" (155 Cal.App.2d at p. 196.) Here the lessor-owner is entitled to indemnity from the lessee-user. (Veh. Code, § 17153; *Aynes* v. *Winans* (1948) 33 Cal.2d 206, 208 [200 P.2d 533]; *American Motorists Ins. Co.* v. *Underwriters at Lloyd's London, supra,* 224 Cal.App.2d 81, 83; *Heves* v. *Kershaw* (1961) 198 Cal. App.2d 340, 343-344 [17 Cal.Rptr. 837].)[7]

Home, if it covers the liability of AAA for the vehicle in question, must cover Vega as a permissive user. Nevertheless, it would be a perversion of the policy terms, which subrogate it[8] to the rights of its insured, to require it to prorate with

[7]Plaintiffs offered to show that Quinlan made no claim against AAA except under sections 17150-17151 (see also § 17155) of the Vehicle Code. Mission's objections to their proof were erroneously sustained. In the absence of proof to the contrary it will be inferred that there was no other basis for the owner-lessor's liability. (Cf. *Pleasant Valley Assn.* v. *Cal-Farm Ins. Co.* (1956) 142 Cal.App.2d 126, 135-136 [298 P.2d 109].)

· [8]The Home policy provides: "*Subrogation*: In the event of any payment under this policy, the company shall be subrogated to all the

the insurance which the insured owner had bargained for to protect himself and reduce the cost of his insurance. No such contractual relations are found in the cases which required the excess policy to prorate with the prorate policy.

■ Where, as here, the owner's policy is excess and the lessee's "owner's" policy is prorate, the latter will be treated as primary. (*Wilshire Ins. Co.* v. *Transit Cas. Co.,* *supra,* 248 Cal.App.2d 719, 723-724.) There is, therefore, no insurance with which Tower can prorate, and Mission's insurance attaches before that provided by Home. (*Fireman's Fund Indem. Co.* v. *Prudential Assur. Co., supra,* 192 Cal. App.2d 492, 501.)

At the time of the accident both Vega and AAA were entitled to have Tower and Mission indemnify them to the full limit of $100,000/$300,000. Since this insurance was primary, and the insurance, if any, furnished by Home was excess, it is unnecessary to further consider whether Home's policy excluded all liability for the vehicle in question, or, if not, properly limited its obligations.

*Effect of Subsequent Events*

The trial court correctly found, in the light of the provisions of the Mission policy which have been quoted above, "That by the terms of the Mission excess policy it incurred no obligation unless and until the primary policy of Tower had paid or had been held to pay the sum of $10,000." The trial judge in summing up indicated that Mission could not be liable because the $10,000 primary insurance furnished by Tower, which paid only $9,000 toward the claim and in settlement of this action, was not exhausted.

Mission attempts to support the judgment on the same theory and suggests that there was something nefarious in the compromises arranged between Quinlan, Vega, Tower and Home.

The approach adopted by the trial court and now advocated by Mission fails to consider that the respective rights and obligations of the parties and the insurers became fixed at the time of the accident. The present action was commenced to determine those rights. The court in this action has the power to determine whether Tower should be "held liable" to pay the full amount of its liability. The fact that Tower elected to

insured's rights of recovery therefor against any person or organization and the insured shall execute and deliver instruments and papers and do whatever else is necessary to secure such rights. The insured shall do nothing after loss to prejudice such rights."

compromise that issue with Home does not change the fact that it either was or was not so liable at the time of the accident. Nor does it preclude plaintiffs from adjudicating that issue with Mission, unless Mission has been prejudiced because of the subsequent settlement.

No such prejudice is shown. When first approached by the attorney for Quinlan, the attorney for Mission replied, with copies to all concerned: "I do not feel that our coverage is involved. in this lawsuit at all and in the event that it is, we will, of course, honor any obligation that exists.

"I will state that any settlement made by anybody shall be considered without any prejudice to any rights which anybody may have concerning any subsequent determination of coverage."

Mission's attorney was advised that the Quinlan case was being settled by the payment of $40,000, $31,000 contributed by Home and $9,000 by Tower. He was requested to agree that the settlement was reasonable, that Home was not a volunteer,[9] and that the settlement would be without prejudice to the respective theories or contentions of Home and Mission in this action. He so agreed on behalf of Mission.

Mission suggests that the dismissal of this action as to Vega and Tower operated as a retraxit (see *Rothtrock* v. *Ohio Farmers Ins. Co.* (1965) 233 Cal.App.2d 616, 621 [43 Cal. Rptr. 716]), and precluded any binding adjudication against them. This confuses the issue. Plaintiffs originally sought a binding adjudication against all persons concerned. For reasons best known to themselves, some of the parties compromised rather than await the final adjudication of the court. [10] The compromise does not preclude a determination of the rights and obligations of the dismissed parties insofar as those rights and obligations are material to the matters remaining at issue. Plaintiffs' rights are not derivative but arise directly against Mission. (See *United States Fire Ins. Co.* v. *Transport Indem. Co., supra,* 244 Cal.App.2d 110, 119-120.)

If Tower were still in the case it would be adjudged liable to Home for $1,000. That plaintiffs saw fit to waive the possibility of such recovery does not strengthen Mission's position.

_____

[9]Home, despite its contention that it did not cover the loss, was not a volunteer. If Mission's contention that no other insurance was in effect would be sustained, it admittedly would be liable. (See *Employers etc. Ins. Co.* v. *Pacific Indem. Co.* (1959) 167 Cal.App.2d 369, 376-381 [334 P.2d 658].)

The only prejudice to Mission resulted from its failure to accept an earlier opportunity to participate in the settlement, instead of insisting that it provided no coverage.

*The Case Against the Agent*

 Since Mission was properly held liable there can be no recovery against the agent for failure to secure the insurance requested. (See *Walker* v. *Home Indem. Co.* (1956) 145 Cal.App.2d 318, 325-326 [302 P.2d 361].)

The agent seeks a penalty for a frivolous appeal. (Cal. Rules of Court, rule 26(a) ; and see *Scott* v. *Texaco, Inc.* (1966) 239 Cal.App.2d 431, 437-438 [48 Cal.Rptr. 785].) In this case there were reasonable grounds for joining Clark because of Mission's persistent denial that it had any insurance in force at the time of the accident. No opinion is expressed on the merits of the matter, but the question of costs and expenses would more appropriately be litigated between principal and agent, than between third party and an agent whose actions have been disclaimed by his principal.

There will be no factual issues to be determined after a reversal of the judgment. The errors of the trial court were all in the legal conclusions drawn from the uncontradicted facts, whether listed as findings of fact or conclusions of law. It is, therefore, appropriate to reverse with directions. (*Continental Cas. Co.* v. *Phoenix Constr. Co., supra,* 46 Cal.2d 423, 440; *Industrial Indem. Co.* v. *General Ins. Co.* (1962) 210 Cal.App. 2d 352, 362 [26 Cal.Rptr. 568].)

The judgment is affirmed as to the defendant and respondent Clark with costs of appeal against plaintiffs and appellants, Home and AAA. The judgment is reversed as to defendant and respondent Mission, with costs to appellants. The case is remanded with directions to the trial court to amend the legal conclusions in its findings of fact and its conclusions of law, and to enter judgment declaring the relative and respective rights and obligations of plaintiffs and defendant Mission in accordance with the views expressed in this opinion.

Molinari, P. J., and Elkington, J., concurred.

The petition of respondent Mission Insurance Co. for a hearing by the Supreme Court was denied September 20, 1967.